1

```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2
   Case No. 19-cv-0328-TMT-MEH
3  _____

4  MICHAEL ABBONDANZA, et al.,

5       Plaintiffs,

6  vs.

7  JASON WEISS, et al.,

8       Defendants.
   _____
9
10            Proceedings before MICHAEL E. HEGARTY, United

11 States Magistrate Judge, United States District Court for the

12 District of Colorado, commencing at 2:02 p.m., September 8,

13 2021, in the United States Courthouse, Denver, Colorado.

14 _____

15            WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16 ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17 _____

18                      APPEARANCES

19            COURTENAY PATTERSON, Attorney at Law, appearing for

20 the Plaintiffs.

21            FRANZ HARDY and JOEL ROTHMAN (via phone), Attorneys

22 at Law, appearing for the Defendants.

23 _____

24                   DISCOVERY CONFERENCE

25
```

2

```
1              P R O C E E D I N G S

2              (Whereupon, the within electronically recorded

3    proceedings are herein transcribed, pursuant to order of

4    counsel.)

5              THE COURT:  Case Number 19-cv-00328, Michael

6    Abbondanza and Tavin Foods, Inc., vs. Jason Weiss, et al.

7    Please make your appearances, starting with the plaintiff.

8              MS. PATTERSON:  Thank you.  Courtenay Patterson

9    representing Michael Abbondanza and Tavin Foods.

10             THE COURT:  Thank you.  For the defense.

11             MR. HARDY:  Good afternoon, Your Honor.  Franz

12   Hardy on behalf of the defendants Huff and Leslie -- Richard

13   Leslie and Brett Huff.

14             THE COURT:  Thank you.

15             MR. ROTHMAN:  Joel Rothman on the phone on behalf

16   of the Weiss defendants and I think my client is also on the

17   phone as well.

18             THE COURT:  Thank you.  Good afternoon to

19   everybody.  Okay, I think, Ms. Patterson, you have the floor.

20             MS. PATTERSON:  Thank you.  Should we keep masks

21   on?

22             THE COURT:  It's your call.  Those on the phone and

23   those on the television don't have to, then you don't have to

24   either.

25             MS. PATTERSON:  Thank you.
```

1          THE COURT:  I'm not going to put you at a

2   disadvantage.  Go ahead.

3          MS. PATTERSON:  Thank you.  Your Honor, this issue

4   came up following the depositions that were taken in Florida

5   on August 13 and August 14 of Mr. Weiss and Mr. Abreu

6   regarding extensive testimony that was heard about five

7   witnesses in particular who were never disclosed in initial

8   disclosures.  The witnesses are Manny Noriega or Hernandez --

9   that's how Mr. -- what Mr. Abreu thought his last name was,

10  but I believe it's Manny Noriega -- George Merwin, Janet

11  Hoyt, a woman named Teresa and a gentleman named Brad.  I

12  don't --

13         THE COURT:  By the way, hold on.  What is your

14  confidence level that Mr. Abreu exists now?

15         MS. PATTERSON:  Oh, my confidence level is pretty

16  high.

17         THE COURT:  Go ahead.  I just wanted to put that in

18  there.

19         MS. PATTERSON:  Yeah.

20         THE COURT:  Go ahead.

21         MS. PATTERSON:  So anyways, these five individuals

22  were testified about extensively at the depositions by both

23  individuals.

24         THE COURT:  What did they do, how did they know?

25         MS. PATTERSON:  So -- okay, so I'll go through each

1    one.  So Manny Noriega is apparently a very long time friend

2    of Mr. Abreu.  He apparently not only accompanied Mr. Abreu

3    to Colorado apparently each time that he came out here, he

4    was also the person -- either he or Ms. Paloni, who is the

5    defendant with the default judgment against her, they were

6    the ones -- one of them was the one who requested the letter

7    from Mr. Abreu's neurologist regarding his condition.

8    They -- Mr. Noriega --

9            THE COURT:  Was Mr. Noriega with him on this trip?

10            MS. PATTERSON:  Apparently.

11            THE COURT:  Well, who said that?

12            MS. PATTERSON:  Mr. Weiss and Mr. Abreu.

13            THE COURT:  Well, why do you say "apparently"?

14            MS. PATTERSON:  That's what they said, that he was

15    with them.

16            THE COURT:  Okay.

17            MS. PATTERSON:  Because I'm still not -- I'm not

18    convinced that he came to Colorado.

19            THE COURT:  Okay.

20            MS. PATTERSON:  But they were supposedly there.

21            THE COURT:  Okay.

22            MS. PATTERSON:  He is the person who, it was at

23    least testified to by Mr. Abreu that provided the affidavits,

24    or at least one of the affidavits for Mr. Abreu to sign.  He

25    was the one who was on the phone with Mr. Abreu for any

5

1   conversations that he had with Mr. Weiss.

2          THE COURT:  No, no, you don't have to say anything

3   more.  I mean, I agree he's a witness.  Whether he was

4   required to be disclosed is a different matter, because under

5   Rule 26(a)(1) you only have to disclose witnesses you're

6   going to use, not witnesses you think your opponent might

7   use.  Now, if they violated a discovery request where you

8   asked for anyone who has knowledge of the events and they

9   didn't disclose it, that's a different matter.  Are you

10  arguing that?

11         MS. PATTERSON:  Well, I believe in my discovery

12  requests there was request for proof of his travels to

13  Colorado, any proof of his travels to Colorado.

14         THE COURT:  Okay.  So I'm not going to assume at

15  the moment that there was any misconduct in not disclosing

16  him previously, but we'll just say that you found out about

17  some new witnesses.

18         MS. PATTERSON:  Right.

19         THE COURT:  Okay.  And so if they all have the same

20  quality as Mr. Noriega, I see your point.

21         MS. PATTERSON:  Well, each one has like a slightly

22  different involvement, but do you want me to go through each

23  one of them?

24         THE COURT:  No.  If you tell me that you believe

25  they're witnesses, I'll accept that.

6

1          MS. PATTERSON:  Okay.  I mean, I believe that they

2     are.

3          THE COURT:  Okay.

4          MS. PATTERSON:  And I've made some attempts already

5     to try and find these people, but again, I've got limited

6     information about them, and two of them I only have first

7     names, which makes it really hard.  And so I would like their

8     contact information to be able to get in touch with them and

9     potentially depose them or --

10          THE COURT:  And you feel like you've exhausted your

11     7.1(a) efforts to confer?

12          MS. PATTERSON:  Yes.  And attached to my statement

13     e-mails with both Mr. Hardy and Mr. Rothman, which I'm

14     pulling up right now, just a moment, but I attached it as

15     Exhibit C.  Mr. Rothman indicated initially when I emailed,

16     which was right after the depositions -- I'm sorry, they were

17     the 11th and 12th of August, not the 12th and 13th.

18          He indicated:  None of the individuals are likely

19     to have discoverable information that my clients may use to

20     support their claims or defenses; therefore, my clients have

21     no obligation to provide such information even if they

22     possessed it.  I responded to that, and his response was, We

23     will not be complying with your request.  So -- and then

24     Mr. Hardy indicated that he had no information about these

25     individuals, so . . .

1           THE COURT:  Okay, so I'm going to turn to the local

2    guy first.  Do you believe that process was appropriate in

3    this context?

4           MR. HARDY:  Well, Your Honor, I guess -- I want to

5    answer your question, but my -- I've communicated with my

6    clients.  They don't know these individuals.

7           THE COURT:  Not the response, though.  The response

8    was, and I'm reading it verbatim:  None of the individuals

9    listed below are individuals likely to have discoverable

10   information that my clients may use to support their claims

11   or defenses; therefore, my clients have no obligation to

12   provide such information even if they possess it.

13          Now, if you're going to say you don't possess it,

14   don't you think it's the more professional thing to start off

15   with that point, we don't have it, rather than all the

16   baloney upfront?

17          MR. HARDY:  Your Honor, that's not my e-mail.  I

18   didn't --

19          THE COURT:  No, no, it's not your e-mail.  I'm

20   turning to you, because you appear in front of me regularly,

21   and I'm asking you, Was that an appropriate response?

22          MR. HARDY:  Well, I don't know the communications

23   between Ms. Patterson and Rothman or all of them.  I had

24   separate communications with Ms. Patterson.

25          THE COURT:  No, no, no, I know, I know.  You know

1   as much as I do about that one.  You can read as easily as I

2   can.  Do you not want to -- if you don't want to answer the

3   question, I won't make you.

4           MR. HARDY:  Your Honor, I don't feel like I have

5   enough information, respectfully, to do your hard job,

6   because I don't know what all the communications were.

7           THE COURT:  No, no, I'm not asking you to do my

8   job.  I'm asking you as an attorney licensed in this court,

9   who appears regularly in federal court, who engages in the

10  discovery process governed by the Federal Rules of Civil

11  Procedure and who knows our rules of conferral, was that an

12  appropriate response?

13          MR. HARDY:  Your Honor, all I can say is I don't

14  know all of the communications that Ms. Patterson and

15  Ms. Rothman -- Mr. Rothman had, so I don't feel like I have

16  enough information to answer that question.

17          THE COURT:  Okay.

18          MR. HARDY:  I have different communications.

19          THE COURT:  So Mr. Rothman, not what I would

20  expect.  So why don't you respond to my question.  You're

21  silent, mute.

22          MR. ROTHMAN:  Can you hear me now?

23          THE COURT:  Yes.  No, not now.  You're silent

24  again.

25          MR. ROTHMAN:  How about now?

1          THE COURT:  Just heard that.

2          MR. ROTHMAN:  Okay, good, all right.

3          So, Your Honor, I guess the first thing is I need

4    to apologize for the baloney, but, Your Honor, the question

5    was, Am I going amend my client's Rule 26 disclosures?  And

6    there was effort made extensively at the deposition by

7    counsel to obtain information about these individuals.  I

8    don't even think that my client knows -- and he's here on the

9    video.  I don't even think that he knows how to contact these

10   folks.  So we can certainly ask him.  There is no reason why

11   we would want to obstruct Ms. Patterson from obtaining

12   information about these folks, but I responded to the e-mail

13   by saying what -- what is our position, which is that these

14   are not folks that we're going to rely on.

15         THE COURT:  Well, no, no, no, that's not what you

16   said.  All right, let's all be clear.  You said, They're not

17   relevant, we're not doing it.  And besides that, we're not

18   even telling you whether we know where they are or not, but

19   that was not a good response.  If you really didn't know

20   where they are, that's a great answer and it avoids

21   controversy, but you don't get to decide who is relevant to

22   their claims.  They get to decide that.  When there is a

23   disagreement, I decide it.  But we don't deny one another

24   information by assuming my role in determining what's

25   relevant or not.  So that's number one.

1           Number two, you have your client here.  He's

2      appearing voluntarily.  I didn't ask him to be here, so I'm

3      going to ask him:  Do you have any information about where

4      these five people are, one or more?

5           (Pause)

6           I guess I scared the devil out of him.

7           MR. ROTHMAN:  I don't think he scares that easily.

8           THE COURT:  I agree, I agree, clearly.  So I'm sure

9      he's had lots of people threaten him for the cases that he's

10     brought, so he doesn't scare easily.  We'll wait for a

11     minute.

12          MR. WEISS:  I apologize, I'm back.

13          THE COURT:  We hear you and we see you.

14          MR. WEISS:  I apologize.  I was frozen, so I didn't

15     hear what happened.

16          THE COURT:  Okay.  So Mr. Weiss, I asked you, Do

17     you know or have some information, at least, you could share

18     with us, about any of the five persons, their current

19     whereabouts?

20          MR. WEISS:  I do not have information on their

21     current whereabouts, no, Your Honor.

22          THE COURT:  Okay.  So it true that Mr. Noriega came

23     with you -- came with you on any of your -- came with your

24     client, Mr. Abreu, on any of his trips?

25          MR. WEISS:  That's what I was told.  I was not

1    there.

2            THE COURT:  No, no, no, I know you weren't there,

3    but if you don't mind telling me, how many cases have you

4    brought for Mr. Abreu?

5            MR. WEISS:  Probably 2- -- north of 200.

6            THE COURT:  How many times have you spoken to him?

7            MR. WEISS:  Anywhere from five to ten.

8            THE COURT:  And for each of those cases that you

9    brought on his behalf, did you do a reasonable factual

10   investigation before you brought the case?

11           MR. WEISS:  Yes, Your Honor.

12           THE COURT:  And would that have included, Were you

13   with anybody when you came?

14           MR. WEISS:  I did not ask that question, Your

15   Honor.

16           THE COURT:  Okay.  All right, so Ms. Patterson, we

17   have his statement to a judicial officer and it is a no.

18   What do you want me to do about that?

19           MS. PATTERSON:  So -- well, I know at least -- so

20   Janet Hoyt is one Mr. Weiss' former clients as well.  She was

21   the notary on Mr. Abreu's affidavit and she is also one of

22   Mr. Weiss' ADA clients for which he filed approximately 100

23   lawsuits.

24           THE COURT:  What's her involvement?

25           MS. PATTERSON:  She's the one who apparently

1    notarized Mr. Abreu's affidavit saying he came to Colorado.

2    She indicated that he was personally known to her.

3    Mr. Abreu's testimony is he has no idea who that woman is.

4    But what I'm saying is, with regard to a disclosure,

5    Mr. Weiss should definitely know who she is because she was

6    his client in a hundred cases.

7            THE COURT:  Wait.  Is there an affidavit she

8    notarized that I can look at on my ECF?

9            MS. PATTERSON:  Yes.  Hang on, I just need to -- I

10   have it, just give me one moment, if you don't mind.

11           THE COURT:  Not on that -- not on -- well, not in

12   this case, at least.

13           MS. PATTERSON:  Well, it's an exhibit in this case

14   too.  I just need to -- I just need to find it in my files.

15   I apologize.

16           THE COURT:  All right.  Do you remember what

17   document it would have been appended to?

18           MS. PATTERSON:  So it was an affidavit attached to

19   the motion for summary judgment in the underlying case.  I do

20   know that.

21           THE COURT:  All right.

22           MS. PATTERSON:  And it was an exhibit, I know, in

23   our -- in the depositions.  I believe it was probably

24   attached to one of the defendants' motions as an exhibit, but

25   I don't recall which motion.

1           THE COURT:  What's the underlying case number?

2           MS. PATTERSON:  The underlying case number is 16 --

3   one second -- I lost the WiFi.

4           THE COURT:  Anybody.

5           MR. HARDY:  It's 16-cv-432.

6           THE COURT:  So you're saying, Mr. Abreu's motion

7   for summary judgment?

8           MS. PATTERSON:  It was Mr. Abreu's motion for

9   summary judgment, yes.

10          THE COURT:  Okay.  Docket 50-1, it's called

11  affidavit in support of motion for summary judgment. It's by

12  Santiago Abreu.  It's dated -- well, the signature page is a

13  copy whereas the rest of the document seems like it's a .pdf,

14  and it's dated blank day of January 2017 and it's signed by

15  Janet, it looks like Hoyt, Janet B, Hoyt.  So -- and, yeah,

16  her stamp says that.  So what say you, Mr. Weiss, about that

17  one?

18          MR. WEISS:  What's the question, Your Honor?

19          THE COURT:  Well, presumably Santiago Abreu didn't

20  draft and get executed by a notary his own affidavit.  Did

21  you have something to do with the creation of that thing?

22          MR. WEISS:  The drafting?  Yes, Your Honor, and

23  that's as far as my involvement.

24          THE COURT:  So you asked him to get it notarized

25  and he did it through whatever means he could?

1            MR. WEISS:  Absolutely, Your Honor.

2            THE COURT:  All right.  What do I do with that

3       then?  That's plausible and there is nothing wrong with it.

4            MS. PATTERSON:  Right, but in terms of contact

5       information for Ms. Hoyt, because he testified at his --

6       Mr. Weiss testified at his deposition that she's the same

7       Janet Hoyt that he represented in over 188 lawsuits.  He

8       clearly knows who she is.

9            THE COURT:  Well, did you happen to look at Pacer?

10           MS. PATTERSON:  For -- I mean, I've looked up --

11      I've looked up some of those complaints that he filed on her

12      behalf, but it doesn't have an address.  I mean, it just has

13      her -- her name, which I have and I've looked up and there

14      are Janet B. Hoyts in Florida.  I -- before I send my PI out

15      to go contact each one of them to try and figure out which

16      one it is, that seemed --

17           THE COURT:  Have you checked the state's database

18      for notary republics?

19           MS. PATTERSON:  I did, and so I don't have an

20      address for her.  I've got a list of the, like, Florida

21      notaries with that name.  I have to pull it back up.

22           THE COURT:  Doesn't Florida list their current

23      notaries?

24           MS. PATTERSON:  It has a list of them and she's

25      listed as a notary, but, again, it doesn't have the address

1    listed.

2            MR. ROTHMAN:  Your Honor, there is only one Janet

3    B. Hoyt who is registered as a notary in the state of

4    Florida.  Her notary ID number is 663830.  And the listing

5    online has a -- her bonding agency and it has an address.

6    It's just the city, state and zip, but it does seem to

7    indicate that she's associated with an insurance company.

8    Her -- her notary says it expired last year in March, so that

9    would be perhaps a reason why it doesn't have accurate or

10   up-to-date information, but certainly more information than

11   we have.

12           THE COURT:  All right.  You say it lists the city

13   and state?

14           MR. ROTHMAN:  Yeah, it lists mailing address of

15   Lake Worth, Florida 33461.

16           THE COURT:  All right.  Well, anyway, did you --

17   Mr. Weiss, did you represent this person?

18           MR. WEISS:  I did in the past, yes, Your Honor.

19           THE COURT:  As recently as what?

20           MR. WEISS:  Probably about a year ago.

21           THE COURT:  No current active cases?

22           MR. WEISS:  No, Your Honor.  I haven't filed

23   anything for her, I don't believe, since before COVID

24   started.

25           THE COURT:  Any pending cases?

1          MR. WEISS:  No, Your Honor, not that -- not that I
2    can recall, no.
3          THE COURT:  Okay.  Would you just please provide
4    your counsel her address as you know it, and he'll provide it
5    to Ms. Patterson, okay?
6          MR. WEISS:  I will go book and find an address that
7    I have, Your Honor.
8          THE COURT:  Most recent.
9          MR. WEISS:  Yes, Your Honor.
10          THE COURT:  So that's one person.  Next, please.
11          MS. PATTERSON:  Another person is Brad.  He was
12    testified about by Mr. Weiss that this person did tile work
13    at Mr. Weiss' home.  I believe the -- it was either the first
14    or the second time --
15          THE COURT:  Tile work?
16          MS. PATTERSON:  Yes, I know, it sounds totally
17    irrelevant and unrelated, but this is how he came to meet
18    Mr. Abreu.  So Brad was apparently doing tile work, Brad had
19    some sort of work truck, Mr. Abreu was in the back of it, or
20    somebody came in the truck and Abreu was in the back of it
21    when Brad was there doing tile work.  Nonetheless, Brad was
22    there and somehow was affiliated with Mr. Abreu or being
23    there when Mr. Weiss met Mr. Abreu.
24          THE COURT:  Okay.  Well, let's go back to Hoyt for
25    a second.

1          MS. PATTERSON:  Okay.

2          THE COURT:  All a notary does is verify the

3    signature.  They don't have verify facts or anything like

4    that.  What could you possibly get out of her that's relevant

5    to this case?

6          MS. PATTERSON:  She's supposed to observe him sign

7    it.

8          THE COURT:  Correct.

9          MS. PATTERSON:  Mr. Abreu has no recollection of

10   signing anything in front of any woman.  She indicated that

11   he was personally known to her, like not -- verified his

12   identification, and she's another client of Mr. Weiss.  I

13   mean, so --

14         THE COURT:  Well, did he deny signing something or

15   he just didn't recall?

16         MS. PATTERSON:  He says he has no recollection of

17   it.  He has no recollection of signing it, he has no

18   recollection of Ms. Hoyt.  He said -- he said if he did sign

19   it, because he said that's my signature, so I clearly did

20   sign it.  I don't remember doing it.  Like he has no

21   independent recollection of actually signing it.  And he said

22   that he didn't read the affidavit nor was it read to him.

23         THE COURT:  No, but a notary wouldn't do that.

24         MS. PATTERSON:  No, I'm not suggesting that a

25   notary would do that, but was basically testified to is that

1  he was given a piece of paper that has his signature on it,

2  so he thinks he must have signed it if his signature is on

3  it, but he doesn't remember doing it.  He didn't do it in

4  front of any notary at all, let alone Ms. Hoyt, and it was

5  given to him to sign -- a piece of paper was given to him by

6  I believe he said it was Manny Noriega.  So somebody

7  apparently gave him a piece of paper that he apparently

8  signed.  He's not sure if there was multiple papers to it or

9  if it was just a signature page.  He didn't sign it in front

10  of a notary.  And then Ms. Hoyt is saying that he was

11  personally known to her and that he, you know, signed it in

12  front of her.  I mean, that's a notary does, right, so . . .

13        THE COURT:  No.  A notary looks at your ID, makes

14  sure you're the same person that's signing this.  The notary

15  doesn't have to know who you are.

16        MS. PATTERSON:  No, but she needs to look and a

17  verify when he signs it, right?  I mean, that's -- every time

18  I've had something notarized, there is a notary back that the

19  notary has, they write down the information from the person's

20  ID and then they watch when the person signs it, you sign it

21  in front of him.

22        THE COURT:  Right.

23        MS. PATTERSON:  And that -- from Mr. Abreu's

24  testimony, that did not occur, none of that occurred.

25        THE COURT:  So if you get Hoyt to say, I never did

1  that, somehow somebody got ahold of a stamp or created a

2  stamp that has her name on it --

3        MS. PATTERSON:  Or somebody went to her and said,

4  Here is a piece of paper with this person's signature, will

5  you please stamp a notary block on it and sign it.

6        THE COURT:  Let's say that's true, that goes to

7  what -- which of your claims?

8        MS. PATTERSON:  This goes to the -- it goes to the

9  RICO, it goes to the conspiracy, it goes to the fraud.  I

10  mean, it supports like the entire conspiracy that was going

11  on here, which --

12        THE COURT:  Okay.

13        MS. PATTERSON:  -- which is what it was before we

14  had the depositions, and then we have the depositions and now

15  there is apparently more people involved in it.

16        THE COURT:  I got it.  I would strongly encourage

17  you, if you do find this person to do it remotely.

18        MS. PATTERSON:  Oh, absolutely.  I'm not going back

19  to Florida.

20        THE COURT:  Okay, all right.  And you said Brad.

21  Brad tiling his house has to do with what?

22        MS. PATTERSON:  Nothing, except that Brad was the

23  person who either brought Mr. Abreu the first time that

24  Mr. Weiss met Mr. Abreu at his home.  Like that's how the

25  connection was made was apparently through this guy Brad.

1   I --

2            THE COURT:  Brad.

3            MS. PATTERSON:  I'm sorry?

4            THE COURT:  Bras was the intermediary between

5   Mr. Weiss and Mr. Abreu?

6            MS. PATTERSON:  Yes.  And of the five people that

7   I've listed, Brad is the least relevant, but there was quite

8   a bit of testimony about each of these five people who all

9   seemed to have this connection to Mr. Abreu and Mr. Weiss and

10  Mr. Abreu's travels around the country to do these lawsuits.

11           THE COURT:  So Mr. Abreu was the one who brought up

12  Brad.

13           MS. PATTERSON:  No, Mr. Weiss brought him up.

14  Mr. Abreu had no recollection of Brad at all.

15           THE COURT:  Okay.  And Mr. Weiss, who is Brad?

16           MR. WEISS:  Brad was a gentleman who came to my

17  house for  I believe the first time that I met Abreu and

18  Abreu was in the back of his van or work truck, and Brad was

19  supposed to do tile work at my house.  I will make this

20  simple, Your Honor.  I checked my phone, I checked

21  everything, I don't have any information on Brad.

22           THE COURT:  Yeah, but did he do the tile work?

23           MR. WEISS:  He did some tile work, which I had to

24  redo anyway, Your Honor.

25           THE COURT:  How did you pay him?

1           MR. WEISS:  Probably by cash.

2           THE COURT:  Shocked, shocked.  I would not have

3    expected anything else.  Okay.

4           MR. WEISS:  And I got what I paid for, Your Honor.

5           THE COURT:  Oh, my goodness, the caricatures in

6    this thing are just unending.

7           Okay, so how did you find him?  On a street corner?

8           MR. WEISS:  No, through the -- through the

9    gentleman Manny.

10          THE COURT:  All right, just go take Manny's --

11   let's find Manny.  So let's go back to Manny.  You get Brad

12   through Manny.  Let's talk about Manny.  Who knows Manny?

13          MR. WEISS:  I know -- I know Manny.  I do not have

14   any contact with that man in probably four plus years.

15          THE COURT:  Wasn't the bad guy named Manuel

16   Noriega?  Wasn't that the bad guy?

17          MR. HARDY:  He was the dictator of Panama for many

18   years.

19          THE COURT:  Whose wife had thousands of pairs of

20   shoes?

21          MR. HARDY:  No, that's --

22          THE COURT:  That's the Philippines, all right,

23   sorry.

24          MR. HARDY:  Manual Noriega is dead.

25          THE COURT:  I'm conflating bad guys.

```
 1          MR. HARDY:  I tried to Google him.  He's dead, if

 2   we're talking about that.

 3          THE COURT:  That's fine.

 4          MS. PATTERSON:  Yeah, when you Google him, it's not

 5   the person from this case that I'm able to locate on Google.

 6          THE COURT:  Okay.  So you asked Mr. Abreu about

 7   Manny Noriega?

 8          MS. PATTERSON:  I did.

 9          THE COURT:  And what did he say?

10          MS. PATTERSON:  He said:  I don't know if that's

11   his last name.  I think that's Hernandez.  I've known him for

12   over 20 years.  We're very good friends, we've traveled all

13   over the place.  I haven't talked to him, I don't know where

14   he is.

15          THE COURT:  Very good friends.

16          MS. PATTERSON:  Very what?

17          THE COURT:  Very good friends.

18          Okay, so what would you like me to do?  I know you

19   think this is playing games, and it might be, but what else

20   can I do, except --

21          MS. PATTERSON:  I know, I understand, I understand,

22   Your Honor.  I was hoping that perhaps there would be a

23   little bit more forthcoming information when we had this

24   hearing, because this is -- this is sort of part of the

25   bigger issue in this case, is that every time try to do
```

1    something -- you know, request something that seems to be

2    like a pretty simple request, particularly when there was

3    probably over 100 pages of testimony dealing with these five

4    particular individuals, because when I tried to parse it out

5    to provide to the Court as opposed to providing the entire

6    transcript, it was going to create such a huge .pdf that I

7    just sent the transcript, because there is so many instances

8    of it.  And yet despite the fact that these people were

9    apparently part and parcel to Mr. Abreu and Mr. Weiss being

10   in each other's lives and filing 279 cases across the

11   country, nobody has any idea who they are or where they are.

12           THE COURT:  So you are a trial lawyer by trade?

13           MS. PATTERSON:  Right.

14           THE COURT:  Can you envision how you're going to

15   use this in this a trial already --

16           MS. PATTERSON:  I mean --

17           THE COURT:  -- without anything more?  If

18   everything you said is true, what you're going to do at trial

19   is, from a surface appeal, very damaging to Mr. Abreu

20   already.

21           MS. PATTERSON:  And I understand, and, Your Honor,

22   the -- I guess, my whole point in this case from the very

23   beginning has been trying to get to the root of the truth.  I

24   mean, it really has.  Like I know that defense counsel --

25           THE COURT:  By the way, did you take a preservation

1   deposition of Abreu?

2          MS. PATTERSON:  I'm sorry?

3          THE COURT:  Did you take a preservation

4   deposition -- I mean, did you take a video deposition?

5          MS. PATTERSON:  Yes.

6          THE COURT:  Okay.

7          MS. PATTERSON:  Yes, and of Mr. Weiss.  So, but I

8   just -- you know, my whole goal in this case from the very

9   beginning, is which is why I sent those letters that we

10  talked about the last time I was here, was to get to the root

11  of the truth.  My goal was not to file a lawsuit and have

12  this drag on for years and years and years.  That was not the

13  point of the exercise.

14         THE COURT:  Well, hold on a second.  Mr. Weiss, is

15  Mr. Abreu a client of yours still?

16         MR. WEISS:  No, Your Honor.

17         THE COURT:  So they have no continuing

18  relationship, so I don't -- I mean, I don't really feel like

19  I have the ability to compel Mr. Weiss --

20         MS. PATTERSON:  Well, I don't think Mr. --

21         THE COURT:  -- to go to a former client.

22         MS. PATTERSON:  Well, I don't think Mr. Abreu would

23  have the -- I mean, the person who would likely have the

24  information is Mr. Weiss, not Mr. Abreu, because Mr. Abreu

25  said he doesn't even know the guy's last name.

1             THE COURT:  Right.  And if Mr. Weiss has it, I'm

2    ordering him to produce it.

3             MS. PATTERSON:  Okay.

4             THE COURT:  If he doesn't, what else can I do?

5             MS. PATTERSON:  Okay.

6             THE COURT:  Do you have -- do you have anything

7    about Manny's whereabouts?

8             MR. WEISS:  No, Your Honor, I do not.

9             THE COURT:  And have you ever spoken to a person,

10   any person who accompanied Mr. Abreu on any of his trips out

11   of state?

12            MR. WEISS:  I've spoken to Manny Noriega before,

13   yes, Your Honor.

14            THE COURT:  That's his name?

15            MR. WEISS:  Yes, Your Honor.

16            THE COURT:  Okay.  And did you ever -- did he ever

17   submit a declaration or an affidavit?

18            MR. WEISS:  You're asking about Manny?

19            THE COURT:  Yes.

20            MR. WEISS:  No, Your Honor, never.

21            THE COURT:  Okay.  And you've spoken to him in

22   person or on the phone?

23            MR. WEISS:  I've met him in person and I've spoken

24   to him on the phone.

25            THE COURT:  But you don't know how to get ahold of

1   him?

2           MR. WEISS:  I haven't spoken to him, Your Honor, in

3   probably five-plus years.

4           THE COURT:  Have you looked for a phone number form

5   him?

6           MR. WEISS:  I did look, and the only -- I can

7   provide one, but I don't believe it's the current number, but

8   I can provide one.

9           THE COURT:  You know, this is fun for me anyway, so

10  why don't you tell us what the current number is that you

11  have.

12          MR. WEISS:  I would need to go ahead, and if you

13  want to give me one second.

14          THE COURT:  Yep, you have plenty of time.

15          What about Mr. Merwin, who is that?

16          MS. PATTERSON:  So Mr. Merwin is apparently --

17  among other things, he was the person who apparently loaned

18  the van to Manny and Mr. Abreu to travel across the country

19  which resulted in a lot of these lawsuits.

20          THE COURT:  So they didn't fly and so there is no

21  FAA record or --

22          MS. PATTERSON:  Right, there is the only one

23  ticket --

24          THE COURT:  -- Homeland Security record of him

25  having traveled.

1          MS. PATTERSON:  Right, there was only the one

2   ticket that was booked that they provided.  It was a one-way

3   ticket from Fort Lauderdale to Denver.  It was from March of

4   2016, which was nine months after he was apparently at my

5   client's restaurant, and he never actually took the flight.

6   He booked it.  He checked in for, he unchecked in and he

7   never took it, because I subpoenaed United's records.

8          THE COURT:  Okay.

9          MS. PATTERSON:  Now, that doesn't -- now, he did

10  testify -- Mr. Abreu did testify that he traveled I think it

11  was -- it was Jet Blue.  Not to Colorado, on other flights

12  that he had taken.  So there would be FAA records of that,

13  which I have not had a chance to subpoena because --

14         THE COURT:  So it was Merwin's van they took?

15         MS. PATTERSON:  Yes.  And I believe Mr. Merwin

16  drove with him on one of the trips and then was already in

17  Colorado for one of the trips.  And Mr. Merwin has

18  connections with Mr. Noriega.  Mr. Merwin has connections

19  with Mr. Weiss.  They were friends or maybe still are.  He

20  has connections with Mr. Abreu.  And he also has connections

21  with Ms. Paloni who is one of the other defendants in the

22  case.

23         THE COURT:  Okay.  Anything new on Noriega there,

24  Mr. --

25         MR. WEISS:  Yes.  The number that I was able to

1  find, Your Honor, was (561)373-4296.

2          THE COURT:  I'm going to call it just for kicks.

3          (Phone call attempted.)

4          THE COURT:  I would say it's not a working number.

5          MS. PATTERSON:  I'm surprised.

6          THE COURT:  It just disappeared.  So there you go.

7  So he's given you all he has there, at least -- is that all

8  you have on Noriega, Mr. Weiss?

9          MR. WEISS:  Yes, Your Honor, that's all I have.

10         THE COURT:  Okay.

11         MS. PATTERSON:  Okay.  I mean, I --

12         THE COURT:  Now, do I agree that it's credible

13  Mr. Abreu knows none of this, unless he's either got

14  something going on upstairs or just no memory?  No, but, you

15  know.

16         MS. PATTERSON:  Right, no, I understand, but like I

17  said, Your Honor, I was trying to get the information in the

18  most efficient way possible seeing as we've got deadlines in

19  the case and I'm not trying to send a PI out.

20         THE COURT:  Nothing inappropriate with that.

21         MS. PATTERSON:  Okay.

22         THE COURT:  Okay.

23         MS. PATTERSON:  So --

24         THE COURT:  And then we're down to Teresa.

25         MS. PATTERSON:  Oh, and Teresa -- Mr. Weiss didn't

1    testify about Teresa, I don't believe.  I think it was just

2    Mr. Abreu, and he apparently -- she's another good friend of

3    his, good friend of George Merwin's, good friend of Manny's,

4    and apparently he --

5              THE COURT:  Well, Mr. Abbondanza knows everybody in

6    Bailey, don't you?

7              MS. PATTERSON:  She apparently lives in Bailey, but

8    he doesn't know her.

9              THE COURT:  Okay.  Okay, so what did he say about

10   Teresa?

11             MS. PATTERSON:  Sorry, one moment, I'll pull up

12   the --

13             THE COURT:  Did he visit her on his trip to Bailey?

14             MS. PATTERSON:  He apparently stayed with her for

15   days, weeks, or months.  It's unclear.

16             THE COURT:  Okay.  And did he say how he found her

17   house?

18             MS. PATTERSON:  No.  I'm just looking at the

19   transcript.  So I said:  What were you doing in Bailey?  He

20   said:  Me and Jesus had a friend that still lives there.  He

21   doesn't know Jesus' last name, although he speculated.  I

22   said:  Okay, who is your friend that lives there?  He said:

23   Teresa.  I said:  Teresa what?  He said:  I would be lying if

24   I told you her last name.  I didn't ask -- well, it goes on

25   from there, but he met her through Jesus, and he testified --

1    he said he met her when he went to Colorado that first time,

2    which would have been I believe the time that he would have

3    gone to my client's restaurant and he just said he was -- she

4    was his go-to friend when he's in Colorado.

5           THE COURT:  But I mean, nothing you just said

6    indicates he stayed with her.

7           MS. PATTERSON:  Well, because he had said it at

8    first, but then he said that he didn't stay with her.  She

9    was a friend that he would go to when he was in Colorado and

10   he spent time with.  I thought he meant he stayed with her,

11   but apparently he didn't actually stay overnight, but he

12   spent time with her in Bailey when he was in Colorado.

13          THE COURT:  Okay.  Can we at least agree that some

14   of this sounds odd?  Anybody agree with me on that?  Anybody

15   on the defense side?

16          MR. ROTHMAN:  Your Honor -- Your Honor, I would say

17   that, first of all, if you were there to witness Mr. Abreu's

18   testimony, you would see he suffers from very advanced

19   multiple sclerosis.  His -- while he comes across as being

20   very truthful and honest, he also was very honest about how

21   his memory for things is not what it used to be.  He

22   testified that he is actually living on borrowed time because

23   the average mortality for someone with his disease has

24   expired since he was diagnosed.

25          So he testified, I thought and others thought, very

1   credibly.  The events in question were a long time ago.

2   Apparently the reason for his -- his break in communication

3   from Mr. Noriega had to do with a dispute over a woman, which

4   doesn't surprise me that two guys might not be talking to

5   each other if one was upset about something having do with

6   the other's girlfriend, which apparently was what it was

7   about.

8         You know, Mr. Abreu is barely able to take care of

9   himself.  He has an aide.  He has no ability to be

10  ambulatory.  It's very sad.  And the -- it was not easy for

11  him to even make it to the deposition.  He was -- he was able

12  to last until about 4 o'clock.  Thankfully we were able to

13  finish up in time.

14        You know, I think looking at him, I don't think

15  anyone would doubt, first all, that he is disabled; second of

16  all, that he is committed to and was in the past committed to

17  being a plaintiff who used the Americans With Disabilities

18  Act the way it was intended by Congress, which is that

19  private actors should bring these lawsuits.

20        There was an article in the New York Times maybe a

21  week before his deposition about a gentleman in California

22  who has filed probably as many lawsuits as Mr. Abreu did, and

23  there is a need for the remediation that occurs when these

24  lawsuits are filed because it hasn't occurred, because

25  Congress never allocated any money to government enforcement

1   of the ADA.

2        So folks like Mr. Abreu, who have suffered

3   disabilities and the humiliation he described feeling at the

4   River Bend, I think it is understandable and I don't think

5   that viewing his testimony as I did all day after hearing

6   Mr. Weiss' testimony, I really don't think that -- that any

7   of it was fishy at all.  It was very understandable, very

8   credible to me.

9        THE COURT:  Well, that will be up to a jury, but

10  I've got to say, your description of Mr. Abreu sounds quite

11  contradictory to a person who travels all over the United

12  States frequently.  I have some experience with that, so --

13        MR. ROTHMAN:  But this was -- but this was over

14  five years ago when his disease had not progressed the way it

15  has now.

16        THE COURT:  Okay.

17        MR. ROTHMAN:  And --

18        THE COURT:  Yeah, I don't need to hear anything

19  else.

20        MR. ROTHMAN:  That's just the truth.

21        THE COURT:  I can't help with -- there is nothing I

22  can do.  Even if I disbelieve Mr. Abreu, even if I disbelieve

23  Mr. Rothman, there is nothing I can do.

24        MS. PATTERSON:  I understand, I understand, Your

25  Honor.

1          THE COURT:  Okay.  So I've set in course what I can

2     and just admonish the defense to provide whatever information

3     they have about any of these five, but that's all I can do.

4     All right.

5          What's the next issue?

6          MS. PATTERSON:  That -- those were all of my

7     issues.

8          THE COURT:  Okay, I thought there was an issue with

9     Paloni's depo.

10          MS. PATTERSON:  So I -- I included that only

11    because Mr. Rothman said he was going to make it an issue at

12    this discovery conference.  So I don't know if it is or is

13    not, because it wasn't included in his statement, but I just

14    put it in there preemptively just in case.

15          THE COURT:  Okay.  Do we know -- we know where she

16    lives, she just simply defaulted in the case?

17          MS. PATTERSON:  Yes, but I've since gotten her

18    served.  So I couldn't, in all my attempts prior to, to get

19    her actually with -- to have the complaint, but I did send a

20    PI who was able to get her served for the deposition, which

21    I've noticed and is coming up on Tuesday in Arizona.  There

22    will be a Zoom link, which I'm in the process of getting, so

23    that everyone can appear via Zoom, because I understand not

24    everyone is going to travel to Arizona.

25          THE COURT:  Is there any indication she's desiring

1   to participate in the lawsuit?

2          MS. PATTERSON:  Well, I haven't heard from her, but

3   that doesn't mean that other people haven't.

4          THE COURT:  Anybody want to weigh in on that one?

5          MR. ROTHMAN:  Your Honor, the date was not cleared

6   with -- with us.  It was -- and we don't even know if she's

7   going to show up.  And this is a deposition that if it goes

8   forward, either my client or I might wish to attend in

9   person, but it was not run by us.  I'm not trying to stand in

10  the way of Ms. Patterson holding a deposition, if it's going

11  to happen, but we're entitled to the courtesy of knowing what

12  the date is.

13         I had --

14         THE COURT:  Hold on, hold on.

15         MR. ROTHMAN:  -- indicated --

16         THE COURT:  Let's do one point at a time.  And you

17  are correct on that one, so Ms. Patterson.

18         MS. PATTERSON:  I attempted to get additional

19  deposition dates from counsel.  So a couple of e-mails were

20  exchanged with Mr. Rothman and Mr. Hardy, and Mr. Hardy has

21  been -- he has been responsive with dates and things like

22  that.  I basically said, look, There might be some additional

23  depositions I want to take.  At the time I -- again, Mr.

24  Paloni was in the wind, I had not been able to get her.  I

25  had sent a different process server to try and get her and

1    had been unsuccessful, so I didn't know she was going to be

2    one of them.

3            Mr. Leiner was potentially going to be one of them,

4    Mr. Leslie was going to be one of them, and so I was looking

5    for just availability over the following month and half, I

6    think I was asking about, of people, because I was trying to

7    herd cats with this many people and so that I could have some

8    dates so that if I decided to, you know, line something up, I

9    would have dates of availability, right.

10           And so Mr. Rothman responded that he did not need

11   to be there in person for any of those depositions and that I

12   was to coordinate with Franz.  He would appear by telephone.

13   There seems no need for me to provide my availability within

14   a month's period of time.

15           So I attempted to --

16           THE COURT:  You're reading verbatim?

17           MS. PATTERSON:  I'm sorry?

18           THE COURT:  You're reading verbatim?

19           MS. PATTERSON:  I know, so I'm trying --

20           THE COURT:  No, I'm asking that question.

21           MS. PATTERSON:  Oh, I am, I'm -- yeah, I think I

22   just read it verbatim.  Well, there was a little bit more at

23   the beginning of it, which was just sort of a rude comment by

24   Mr. Rothman, but nonetheless, I didn't include that.

25           So I attempted to get these dates, and Mr. Hardy

1   provided dates.  And I know he did respond, and I think it's

2   in the e-mail string that I attached as Exhibit D to this

3   statement, he did say that, you know, he joined with

4   Mr. Rothman's e-mail saying that the date wasn't cleared, but

5   he had previously told me that the 14th of August -- or

6   September, excuse me, was a date that he would be available

7   for Mr. Leslie's deposition, and I am not doing Mr. Leslie's

8   deposition, I'm doing Ms. Paloni's that day.

9          And, you know, to be perfectly honest, Your Honor,

10  I -- and this was not to be game playing either.  This is why

11  I was trying to get this information in advance.  But I also

12  didn't want to tip Ms. Paloni off if I have a PI out looking

13  for her, because I've spent thousands -- my client has spent

14  thousands and thousands of dollars to try and get Ms. Paloni

15  served in this case to track her down.  And so by me saying,

16  Well, I'm going to notice this deposition for this date, I

17  have enough of a suspicion --

18          THE COURT:  I don't need to hear anything else.

19          MS. PATTERSON:  Okay.

20          THE COURT:  The circumstances of trying to find her

21  necessitated you doing what you did, I'm fine with that,

22  okay.

23          So -- by the way, Mr. Weiss, would you mind seeing

24  if you can find the last four of Ms. Hoyt's Social Security,

25  if that's in your files.

1          MR. WEISS:  If I have it, I would look, Your Honor.

2          THE COURT:  Okay.

3          MR. WEISS:  But I --

4          THE COURT:  Because there is a bankruptcy filing by

5   a Janet B. Hoyt that if the last four match up, I know

6   exactly where she is, so.  Okay, all right.

7          So I'm not going to cast stones on the process for

8   Paloni.  What involvement did she have?

9          MS. PATTERSON:  She was the expert witness on the

10  ADA case, apparently multiple, but at least on the underlying

11  case.

12         THE COURT:  Okay, fine.  Would you at least find

13  out -- there has only been a clerk's entry of default, not a

14  default judgment.

15         MS. PATTERSON:  Right.

16         THE COURT:  I think most judges would let her back

17  in at this point.  So would you find out at least if she

18  wants to defend herself, and we have a process to appoint --

19  to request pro bono counsel when somebody can't afford an

20  attorney, so we would try to do that for her.

21         MS. PATTERSON:  Okay.

22         THE COURT:  Okay.

23         MS. PATTERSON:  And then if I can just make the

24  other comment in response to Mr. Rothman's, what he was

25  stating, was in regards to his saying, well, you know, he

1    thinks he and his client would like to be in person for it.

2    To be clear, when I sent the notice of deposition last week

3    after she was served, the response I received from

4    Mr. Rothman first, before he said that it was not cleared

5    with him, the first response I got was, Why are you wasting

6    our time with this?  So --

7              THE COURT:  Well, Mr. Rothman is free to try to

8    work out a different date with Ms. Paloni, as long as it's

9    consistent with your schedule.  He can do the legwork on and

10   this he can propose something different for you, okay.

11             MS. PATTERSON:  Thank you.

12             THE COURT:  Barring that, you have your date.

13             MS. PATTERSON:  Thank you.

14             THE COURT:  We all --

15             MR. ROTHMAN:  And, Your Honor, I don't -- I don't

16   have any information for Ms. Paloni.  I don't know how to

17   reach her.  And I responded the way I did because she has

18   been defaulted and I don't even -- is counsel saying that

19   she's confirmed that Ms. Paloni is showing up for the

20   deposition?

21             THE COURT:  No one can ever say that, Mr. Rothman.

22   I mean, you don't ever know until you're actually there and

23   somebody appears.  So I mean, even if -- even if she has

24   Ms. Paloni's word, that's only worth whatever it's worth.

25             So did you serve her at her home?  Where did you

1    find her?

2          MS. PATTERSON:  I believe the PI served her as she

3    was coming out of her home.

4          THE COURT:  Okay.

5          MS. PATTERSON:  Yes.

6          THE COURT:  So give Mr. Rothman that address.

7          MS. PATTERSON:  Oh, he has it because they're the

8    ones who gave it to me.

9          THE COURT:  Well, you have every -- you have all

10   the information she has, Mr. Rothman.  Just like I can't

11   force anything out of you that you don't have, I can't force

12   anything out of Ms. Patterson that she doesn't have, so . . .

13   Okay?

14         MR. ROTHMAN:  Okay.

15         THE COURT:  By the way, did you look, Mr. Weiss,

16   for the last four of -- because I promise you, if you

17   practice law the way we practice law, if you ever settled any

18   of Hoyt's cases, you had to provide a W-9 and the W-9 has

19   their social.  So there ought to be some W-9s in your file if

20   there were any Hoyt cases settled.  Were there any Hoyt cases

21   settled?

22         MR. WEISS:  Yes, Your Honor.  I'm not at the office

23   right now.  I don't have that here.  I have to go into the

24   office and check.  I didn't realize you meant right this

25   second.

1          THE COURT:  No.  So check if the last four are

2     9034.  If they are, we know who she is and where she is,

3     okay?

4          MR. WEISS:  9034?

5          THE COURT:  9034.

6          MR. WEISS:  No problem, Your Honor.

7          THE COURT:  It's a bankruptcy out of Alabama.  If

8     you know your geography, Alabama is right next to Florida, so

9     it's plausible, okay.

10         MR. WEISS:  9 --

11         THE COURT:  -- 034.

12         MR. WEISS:  Okay.

13         THE COURT:  All right, thank you.

14         What else can I do for you all today to help you

15    wrap this guy up?  Mr. Hardy.

16         MR. HARDY:  One item from us, Your Honor.  Just on

17    the financial records, I think I have an agreement with

18    Ms. Patterson.  We just talked about before we started this

19    afternoon.  We don't have to rehash everything, but on July 6

20    we appeared in front of you and you ordered the plaintiff to

21    produce certain financial records, which we have not

22    received.  We've taken the deposition of Mr. Abbondanza.

23         What we're asking for now is just a downloaded copy

24    of the QuickBook financial records from the restaurant.  I

25    think Ms. Patterson has agreed to provide those to us at this

1    point, but I would like to get that on the record so we're

2    not coming back.

3           MS. PATTERSON:  And, Your Honor, we did -- from the

4    July order of the Court, we did provide everything that my --

5    well, that I had, which was basically nothing, and my client

6    had, regarding financials.

7           Now, what was asked for during the depositions was

8    they were specific reports, like P&L reports and things like

9    that from QuickBooks, which my client testified to was only

10   the system that has been used since he reopened the

11   restaurant in 2018, I believe.  And so he didn't have those

12   reports, but he -- he was asked to generate those reports.

13   So he has, which I have, and I was going to provide to

14   Mr. Hardy, but then he said it would be easier to just get

15   the entire QuickBooks download.

16          But I -- what was ordered in July, we have turned

17   over everything that he has, which includes everything from

18   the underlying case and the shutdown of it and all of that,

19   like, he doesn't have anything more of it.  And the system

20   that he was using at the time, any records he had was on a

21   computer that he no longer has on the women -- woman or women

22   who were handling the books back at that time they have their

23   information for, he doesn't have any of it.  And they

24   subpoenaed his accountant who has provided whatever they

25   have.  They've subpoenaed the attorneys in the -- not the

1    underlying case, separate case, unrelated case.  They've

2    subpoenaed them and gotten their records.

3            So everything has been turned over that has been

4    asked for, except for generating new reports, which I didn't

5    realize that we were supposed to be generating reports, but

6    nonetheless, we're happy to provide the -- either the reports

7    that have been generated or the actual just QuickBooks file,

8    which my client needs to figure out how to do because he

9    doesn't handle that.  He has a family member that helps him

10   with it.

11           MR. HARDY:  Your Honor, I don't want to debate it,

12   because I have a different recollection of events.  As I

13   understand it, Ms. Patterson has agreed to download the

14   QuickBooks and provide it to us.

15           THE COURT:  From what time period, though, Mr.

16   Hardy?

17           MR. HARDY:  Well, from whatever time period that

18   they have available.  That's what I'm looking for.

19           THE COURT:  But it has to be relevant information,

20   so how --

21           MR. HARDY:  Since --

22           THE COURT:  Given this occurred, in what year?  20

23   what?

24           MS. PATTERSON:  '15.

25           THE COURT:  '15.  Are you saying that records from

1  2019, 2018 are relevant?

2          MR. HARDY:  Yes, because that's part of their

3  damages analysis.

4          THE COURT:  Okay.

5          MR. HARDY:  On --

6          THE COURT:  Do damages run to date?

7          MS. PATTERSON:  No.  The restaurant has reopened.

8          THE COURT:  I understand that.

9          MS. PATTERSON:  Right.  No, the damages were capped

10  off from when basically --

11          THE COURT:  What's the closed period of damages

12  you're alleging?

13          MS. PATTERSON:  It was from when the restaurant

14  closed, which was in 2017 -- 2016, excuse me, 2016 is when

15  the restaurant actually closed, October.  And then it

16  reopened in April of 2018?  April of 2018.

17          THE COURT:  Okay.  And so what are you seeking?

18  Are you saying that you're not going to seek damages beyond

19  the reopening?

20          MS. PATTERSON:  No, I don't think that's part of

21  our calculations.

22          THE COURT:  Okay.  Mr. Hardy?

23          MR. HARDY:  Actually, it has been part of their

24  calculations.

25          THE COURT:  Well, she's withdrawing that right now.

1          MS. PATTERSON:  So.  Okay, so originally the damage

2     calculation, which I've since -- and again, this is part of

3     what I'm going to turn over as soon as we get out of court --

4     is a recalculated damage calculation because originally the

5     timeline was off and it got cleared up in the deposition, the

6     reopening date, and so it included an extra year of damages,

7     but it was not intended to -- it wasn't meant to include

8     beyond the reopening.  It was just an error that we're going

9     to -- there was testimony about it and I told him that I

10    would give him a new calculation of the damages.  I just have

11    not had the opportunity to do that, but I intend to this

12    week.

13         THE COURT:  So now with that amended statement

14    about damages and it's going to be a closed period, not

15    exceeding the reopening date, what do you need?

16         MR. HARDY:  I would like anything that's responsive

17    to the original request that goes to their damages, because

18    if they have financial records that relate to that, I would

19    like them.

20         THE COURT:  Relate to what, though, Mr. Hardy?

21         MR. HARDY:  To their damages analysis.

22         THE COURT:  So up to and including the date of

23    reopening?

24         MR. HARDY:  That is their damage calculation.  The

25    problem is, Your Honor, I don't know their calculation

1  because it has been a moving target.  I understand it is

2  going to be amended, but it hasn't been amended, so --

3          THE COURT:  Well, it has.  She has just made that

4  representation and that's as good as in writing.  If you want

5  it in writing, that's fine too.  I'll have her go ahead and

6  send a supplemental 26(a)(1) that identifies the closed

7  period of damages.

8          MS. PATTERSON:  Yes, and that's what I was planning

9  on doing.

10         THE COURT:  So -- and do you think there is

11 anything you haven't provided that exists somewhere up to and

12 including the date of reopening?

13         MS. PATTERSON:  No.  I mean, I've talked to my

14 client, his accountant has been contacted about this.  As far

15 as I know, everything that is in their custody and control

16 has been turned over.  Again, there are one or two women who

17 were involved with the business previously:  Serena Shaffer

18 (ph) and Mary Lou Jesperson (ph) who may have had some

19 additional bookkeeping records because that was one --

20         THE COURT:  But they have their names?

21         MS. PATTERSON:  They have all their information.

22         THE COURT:  Okay.  So what else do you think I can

23 do?

24         MR. HARDY:  I don't know, Your Honor.

25         THE COURT:  Okay.

1          MR. HARDY:  I mean, I'm asking the plaintiff, the

2    restaurant to produce their financial records.

3          THE COURT:  Right, and said they have.  That's the

4    end of it for me.

5          MR. HARDY:  And now their damages model has shifted

6    to a prior year.  I might not need those records anymore.

7          THE COURT:  Okay.

8          MR. HARDY:  But before we started today, that

9    was --

10          THE COURT:  That's fine.

11          MR. HARDY:  -- part of the damages analysis.

12          THE COURT:  We now have a different understanding.

13          So what else from either of you?

14          MS. PATTERSON:  Let me just think for a minute

15    before I say that there is nothing.

16          THE COURT:  I agreed.  I mean, I'm not -- it's not

17    binding.  I just want to know what else I can do, to your

18    recollection.

19          MS. PATTERSON:  I don't believe that there is

20    anything else from the plaintiffs.

21          THE COURT:  When is the deposition of Paloni?

22          MS. PATTERSON:  It is happening on Tuesday, the

23    14th.

24          THE COURT:  Where did you say it was?

25          MS. PATTERSON:  In Scottsdale, Arizona.

1          THE COURT:  And is that the last action of

2     discovery for you?

3          MS. PATTERSON:  I'm taking Mr. -- well, it will be,

4     because I'm taking Mr. Huff's deposition on the 13th.  I

5     suppose, like unless there is something different that comes

6     out for Mr. Huff or Mr. Paloni that would warrant or require

7     me to do further depositions, I mean, there is still that

8     chance.  I'm trying not to just set a bunch of depositions

9     unnecessarily.  So it will kind of depend on their testimony.

10    Also, it sort of depends on whether I can track down any of

11    these individuals that were the reason for this conference

12    today, so . . .

13         THE COURT:  That doesn't have to stop with the

14    close of discovery.

15         MS. PATTERSON:  Right.

16         THE COURT:  You can still look for people that you

17    were not reasonably able to find.  And if you find them and

18    want to engage in discovery and the defense doesn't agree,

19    then you just file a motion to take discovery out of time.

20         MS. PATTERSON:  Right, no, and I understand, Your

21    Honor, and I appreciate that.  And I'll see what efforts I

22    can -- I can make to track these people down.

23         THE COURT:  Okay.

24         MS. PATTERSON:  Thank you.

25         THE COURT:  And Mr. Weiss owes us the last four of

1   Ms. Hoyt's Social Security number.

2           What else, Mr. Hardy or Mr. Rothman?

3           MR. HARDY:  I don't believe I have anything

4   further, Your Honor.  Thank you.

5           THE COURT:  Okay, thank you.  Mr. Rothman.

6           MR. ROTHMAN:  Your Honor.  Thank you, Your Honor.

7   The discovery cutoff is September 30 and dispositive motion

8   deadline is November 30.  There has been no experts

9   identified by the plaintiff and there has been no request by

10  the plaintiff to take the depositions of the defendants'

11  experts.

12          I would like to see if we can file dispositive

13  motions sooner than the current deadline, which is November

14  30, because frankly, Your Honor, there has been no

15  conspiracy, no racketeering organization proven, there is no

16  evidence of the commission of any of the predicate felonies,

17  and the plaintiff can't prove any damages, and my client has

18  been defending this case for many years and we would like to

19  bring the issue to a head with the summary judgment motion as

20  soon as possible.

21          THE COURT:  You and I obviously have a different

22  interpretation of the word "deadline," Mr. Rothman.  Nothing

23  is preventing you from filing it two months ago or today or

24  tomorrow.  I'm not sure what you're asking.  You can file it

25  any time you want as long as you feel you're prepared.  What

1    were you asking?

2           MR. ROTHMAN:  All right.

3           THE COURT:  Were you asking something other than

4    that?

5           MR. ROTHMAN:  No, you've answered my question.

6           THE COURT:  Okay, good.  What else from the

7    defense?

8           MR. HARDY:  Nothing, Your Honor.

9           THE COURT:  Okay, thank you, you guys.  Look

10   forward to helping you through this process.  When -- I don't

11   even know -- obviously Judge Tymkovich is -- I think this is

12   his only case left that he has in the district court.  I

13   don't even know what his procedure is for getting you guys

14   teed up for a trial.  So what is our course from here?

15          The referral -- so he did not refer a final

16   pretrial conference, did he?  Not that I can see.  The

17   scheduling order hopefully says that.

18          MS. PATTERSON:  I don't believe there is a date

19   that was --

20          THE COURT:  Yeah, yeah.  So I set a scheduling -- I

21   set a final pretrial, even though (inaudible).  So let's see,

22   I'm going to try and call him and ask what he wants to do

23   about that.  Hopefully his Chambers knows, because I hate

24   paperwork, and if I can do it on the phone, I'll do it.

25          (Phone call was made.)

1          THE COURT:  Okay, I'll take care of that for you

2     guys and I'll make it clear what you're supposed to do.

3     We'll either leave it or change it.  You'll see it up here on

4     the record if it gets changed, okay?

5          MS. PATTERSON:  Okay.

6          MR. HARDY:  Your Honor, what do you have, if you

7     have it up, for the final pretrial conference?

8          THE COURT:  January 10, 2022.

9          MR. HARDY:  And what time?

10          THE COURT:  Mr. Hardy, you're so specific.

11          MS. PATTERSON:  I think it's 10 a.m.

12          THE COURT:  But you, of course, have it calendared,

13     right?

14          MR. HARDY:  I pray every night, Your Honor.

15          THE COURT:  So it is 10 o'clock.

16          MR. HARDY:  Thank you.

17          THE COURT:  I'm an associate -- I go to podunk

18     Kansas law school.

19          MR. HARDY:  I do have it, for the record.

20          THE COURT:  Okay.  And I get a job with the biggest

21     firm in Washington, D.C., Arnold & Porter, right.  And it is

22     the white collar, prestigious firm in Washington, D.C.; 300,

23     400 employees, back in 1988.  And, of course, they staff

24     cases with a dozen people every single case, and I'm low

25     person on the totem pole in a big, big lawsuit at the time

1   between Southland Corporation, which is the 7/11 people, and

2   Ashland Oil Company, which was an oil company out of Ashland,

3   Kentucky, I think.  And the dispute involved the sale from

4   one to the other of an organic chemical plant in New Jersey,

5   which, if you know, in the '80s -- '70s and '80s when the

6   Environmental Protection Act was fairly new, lots of lawsuits

7   over environmental conditions at industrial facilities that

8   transferred hands, right; so litigation was rampant.

9        And there were partners on the case, mid-level

10  partners, who had never taken a deposition in their life in

11  any case, right?  That's the kind of firm it was, because

12  cases are too big to actually do discovery in, or at least

13  anybody but the named partner, first guy, because the client

14  demands that.

15       Anyway, I was in charge of setting up the first

16  deposition in the case.  We were in D.C., obviously, and the

17  first deposition in this case was going to occur in

18  Cleveland, Ohio, on July 5, 1989.

19       So July 4 is a big deal in Washington, D.C., if

20  you've ever been there:  Beach Boys, fireworks, everything,

21  right.

22       So I go to those with my family, two young children

23  and my wife, probably three young children at the time.  We

24  get home 10 o'clock at night on July 4 and I suddenly open my

25  eyes and realize I haven't arranged a court reporter --

1          MR. HARDY:  Oh, my goodness.

2          THE COURT:  -- for the next morning, July 5.  This

3    is a firm that fires people for this kind of stuff.  They

4    fire people for typos in briefs.

5          July 4, 10 p.m., and I said I'm done, I'm toast.

6    And I don't know why I thought about the court reporter, but

7    I did.  Even talking about it makes me sick to my stomach,

8    because I had a young family, I was pretty new, and this was

9    this mid-level partner's first deposition ever, and he was

10   nervous about it all and he gave me the responsibility

11   setting it up.

12         And I did -- I did a stupid thing first, which was

13   call him, right?  That's the stupidest thing I could do at 10

14   o'clock, where he's trying to get sleep, we're catching a 5

15   a.m. flight the next morning from D.C. to Cleveland and -- at

16   National -- it was called Washington National at the time.

17   And he freaks out, is mad at me.

18         And so I call -- I just -- this is the time when

19   you -- the Internet didn't exist.  You only had phone books.

20   I actually opened up a phone book for Washington, D.C., found

21   a court reporting service called Federal Court Reporters,

22   called the number at 10:30 at night and a dude answered.

23         Now, I think it was an angel because the dude said,

24   We'll have somebody there at 9 o'clock the next morning in

25   Cleveland.  Anyway, attorneys within hearing who have worked

1  for big firms as associates can relate to this story because

2  it's the nightmare of any associate, and it worked out, so --

3  and I don't even know how I started telling that story.

4        All right, thank you, you guys.

5        MS. PATTERSON:  Thank you, Your Honor.

6        MR. HARDY:  Thank you, Your Honor.

7        (Whereupon, the within hearing was then in

8  conclusion at 3:15 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     TRANSCRIBER'S CERTIFICATION

 2    I certify that the foregoing is a correct transcript to the

 3    best of my ability to hear and understand the audio recording

 4    and based on the quality of the audio recording from the

 5    above-entitled matter.

 6

 7    /s/ Dyann Labo                    September 23, 2021

 8    Signature of Transcriber          Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```