IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00328-TMT-MEH

MICHAEL ABBONDANZA and
TAVIN FOODS, INC.,

      Plaintiffs,

v.

JASON WEISS,
PETER LEINER,
WEISS LAW GROUP, PC,
BRETT HUFF,
RICHARD LESLIE,
HUFF & LESLIE, LLP, and
GIOVANNIA PALONI,

      Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Before the Court are the Defendants' respective Motions for Summary Judgment. ECF 124, 125, 129. Defendants mutually join each other's motions (ECF 128, 130, 131), to which Plaintiffs filed a unified Response (ECF 151). The Motions are fully briefed, and the Court finds that oral argument will not materially assist in their adjudication. For the following reasons and based on the submitted record, it is respectfully recommended that the Motions be granted in part and denied in part.

## BACKGROUND

### I.     Litigation History

The essence of Plaintiffs' grievance is that they were victims of Defendants' scheme to bring a baseless ADA public accommodation lawsuit against their small business and to extort a settlement. Reviewing the litigation history therefore helps to understanding Plaintiffs' present claims for relief.

### A.     The Underlying Lawsuit of *Abreu v. Tavin Foods, Inc.*, No. 16-cv-00432-MEH (D. Colo.)

On February 23, 2016, Santiago Abreu, a Florida resident, filed a lawsuit against Tavin Foods, Inc., doing business as Riverbend Market and Eatery. In that complaint (ECF 1 filed in 16-cv-00432-MEH), Mr. Abreu stated that he suffers from moderately severe multiple sclerosis and sudden onsets of severe pain. He is paraparetic and requires use of a wheelchair. The subject of the lawsuit was Mr. Abreu's visit to the Riverbend Market and Eatery restaurant ("Riverbend") that Tavin Foods, Inc. operated in Park County, Colorado. Mr. Abreu represented that he "personally visited the Premises and dined at the Premises, but was denied full and equal access and full and equal enjoyment of the facilities, services, goods and amenities within the Premises, even though he was a 'bona fide patron.'" *Id*. at ¶¶ 2-3, 6-7. Attached to the complaint was a photograph of the top of a meal order ticket showing the restaurant's name and address. Nothing of the photographed portion of receipt referred to Mr. Abreu or on its face directly confirmed his physical presence at the restaurant.

He alleged that he "suffered an injury in fact" from the denial of full access as a restaurant visitor. *Id*. at ¶ 17. He identified multiple access barriers that he encountered in the men's restroom, bar area, entrance pathway, and parking lot. *Id*. at ¶¶ 20-23. Mr. Abreu sued under 42 U.S.C. § 12188 of the Americans with Disabilities Act ("ADA") to remove the barriers. Mr. Abreu was

represented by Jason Weiss, Esq. and Peter S. Leiner, Esq. of the Weiss Law Group, PA (a Florida law firm) and by Richard W. Leslie, Esq. and Brett Huff, Esq. of Huff and Leslie, LLP (a Colorado law firm).

Courtenay Patterson, Esq. represented Tavin Foods, Inc. on a *pro bono* basis. ECF 28 (filed in 16-cv-00432-MEH). On February 3, 2017, Mr. Abreu moved for summary judgment. ECF 50 (filed in 16-cv-00432-MEH). Attached to the motion was an affidavit in which Mr. Abreu purportedly confirmed his allegations about visiting the restaurant and encountering ADA violations there.

On February 8, 2017, soon after Mr. Abreu filed his summary judgment motion, Tavin Foods, Inc. moved to extend the discovery deadline to permit Mr. Abreu's deposition. ECF 51 (filed in 16-cv-00432-MEH). The deposition did not take place, and Tavin Foods, Inc. did not respond to the summary judgment motion. Instead, on February 10, 2017, the parties filed a Stipulation of Dismissal with Prejudice (ECF 53 filed in 16-cv-00432-MEH)), and the case was closed (ECF 54 filed in 16-cv-00432-MEH)). Tavin Foods, Inc. paid no money as part of the case's private resolution. ECF 65 (filed in 16-cv-00432-MEH) at 2.

**B.    The Current Lawsuit**

Tavin Foods, Inc. and its owner, Michael Abbondanza, now appearing as the Plaintiffs, sue the attorneys and law firms who represented Mr. Abreu. Courtenay Patterson, Esq., who defended them against the underlying lawsuit, represents them in bringing this lawsuit. ECF 9.

Plaintiffs include Christine Giovannia Paloni, who owns the Florida business, Complete ADA Compliance, as a Defendant. Mr. Weiss retained Ms. Paloni to write the ADA violations report about the restaurant. *Id*. at ¶ 12. Plaintiffs allege that she falsely reported actually visiting the property. Multiple attempts to serve Ms. Paloni with process were unsuccessful (ECF 66, 70,

77), and on February 19, 2021, the Clerk of Court entered a notice of default against her (ECF 91). On December 2, 2021, the Court set the default aside. ECF 134. Although "the default was willful," the Court vacated the default because there would be no prejudice to Plaintiffs that extending the discovery deadline would not cure and the possibility that she might prevail on the merits. *Id*. Ms. Paloni was deposed on October 8, 2021.

Plaintiffs' claims are based on the allegation that Defendants have operated as a conspiracy to file baseless ADA access lawsuits against small businesses for the purpose of obtaining quick settlements. *Id*. at ¶ 13. In support, Plaintiffs cite various irregularities from the underlying case against them. They allege that Ms. Paloni never visited the restaurant in person, contrary to what she represented in her affidavit. *Id*. at ¶¶ 25–27. They say that of the fourteen ADA violations that Mr. Abreu reported in his lawsuit, they found only four, and they were minor. *Id*. at ¶ 24. They dispute whether "Santiago Abreu" even exists, and if he does, whether he actually visited the restaurant. *Id*. at ¶¶ 17, 23, 43–44, 46–48. Plaintiffs say that before they filed the current lawsuit, they had requested proof of Mr. Abreu's trip to Colorado and restaurant visit but received none. *Id*. at ¶ 45. The question over whether Mr. Abreu is an actual person remained open and unanswered for some time.

On June 30, 2021, Plaintiffs moved to add him as a Co-Defendant, but the request was denied on timeliness grounds. ECF 106, 108. Mr. Abreu was deposed on August 12, 2021.

Plaintiffs also refer to how the underlying lawsuit was litigated. Defendant Huff twice sent settlement offers, but then on October 19, 2016, he reported that he might have to withdraw as Mr. Abreu's local counsel because he may become a witness. *Id*. at ¶¶ 29–33. Plaintiffs were unsuccessful in deposing Mr. Abreu for that lawsuit. *Id*. at ¶¶ 36–37. Then Mr. Abreu filed a summary judgment motion even though no discovery had taken place. *Id*. at ¶ 38. After Plaintiffs

reported correcting the four violations that their expert found, Mr. Abreu's counsel agreed to dismiss the case without seeking verification. *Id*. at ¶¶ 39–41.

Plaintiffs argue that the Defendants not only acted as a conspiracy but as a criminal enterprise that Defendant Jason Weiss headed. *Id*. at ¶¶ 51–60. Plaintiffs claim as damages their litigation and investigation costs, the loss of their restaurant business, and non-economic damages. *Id*. at ¶¶ 103, 159.

### C.      Claims for Relief

Plaintiffs express their grievance through six causes of action. They allege that Defendants' conduct constitutes organized racketeering in violation of the Racketeer Influenced and Corrupt Practices Act, 18 U.S.C. §§ 1961, *et seq*., ("RICO") (First Cause of Action), RICO conspiracy (Second Cause of Action), and the Colorado Organized Crime Control Act, C.R.S. § 18-17-101, *et seq*., ("COCCA") (Third Cause of Action). Plaintiffs bring the additional state law claims of abuse of process (Fourth Cause of Action), civil conspiracy (Fifth Cause of Action), and fraud (Sixth Cause of Action). ECF 8-1.

## III.     Scope of the Evidentiary Record

### A.      Litigant and Witness Deposition Testimony

Deposition testimony is a central feature of the current evidentiary record. For example, it provides the main evidence on whether Mr. Abreu and Ms. Paloni each actually visited the Riverbend restaurant. Plaintiffs object to Defendants' reliance on deposition testimony (and for Mr. Abreu, two affidavits on the same subject) to establish those two facts. Plaintiffs contend that their credibility is in doubt and should be left for the factfinder to resolve.

As a general rule, a party may not defeat the entry of summary judgment simply by calling a witness's credibility into doubt. It is irrelevant to the summary judgment analysis whether the

court believes the movant's evidence. The court's task instead is to determine whether the nonmovant offers any specific facts that demonstrate the existence of a material fact to be tried. This obliges the nonmovant to do more than merely attack the credibility of the evidence. The nonmovant must provide its own evidence to place the matter in dispute. *Helget v. City of Hays, Kan.*, 844 F.3d 1216, 1224, n.3 (10th Cir. 2017); *Wood v. Handy & Harman Co.*, 318 F. App'x 602, 606-07 (10th Cir. 2008); *Nat'l Am. Ins. Co. v. Am. Re-Ins. Co.*, 358 F.3d 736, 742-43 (10th Cir. 2004); *Simmons v. Potter*, No. 08-cv-02593-WYD-KLM, 2010 WL 3002038, at *2 (D. Colo. July 29, 2010). In light of the above general rule, the Court takes into consideration what the various parties said at deposition about what happened. As to whether Plaintiffs create a genuine dispute over those same matters, the Court makes that determination in the below analysis.

Plaintiffs also object to any offered evidence that could be construed as confirming that Mr. Abreu and Ms. Paloni each actually visited the restaurant. Plaintiffs prefer that the factfinder make that determination. For present purposes, the Court will consider all relevant, admissible evidence to make the determination of whether those questions remain in dispute in a material way.

### B.      Judicial Notice of Prior Lawsuits

Relevant to this lawsuit is what happened during two prior lawsuits. At ECF 65, the Court already addressed the subject of taking judicial notice of filings in them. *See also Abbondanza v. Weiss*, No. 19-cv-00328-TMT, 2020 WL 13076985 (D. Colo. Oct. 27, 2020). There, the Court said it would take notice of what documents were filed or what allegations or stipulations were made, but not the truth of their contents. For example, the Court takes notice only of what litigants alleged in the prior lawsuits but without deciding whether the allegations are true.

## III.    Material Undisputed Facts

Each Defendant joins the others' summary judgment motions, but they do not provide one common statement of material undisputed facts. Therefore, the Court creates its own unified statement of the relevant facts as drawn from the overall briefing and record.

### A.    Defendants, Mr. Abreu, and Their Associates

#### 1.    <u>Mr. Abreu and Manny Noriega</u>

1.      At his deposition, Mr. Abreu stated that he is forty-two years old and has lived in Florida for the past thirty-two years. He has a GED. He was diagnosed with multiple sclerosis in April 2008, and the condition causes a variety of impairments. He uses a wheelchair or motorized scooter for mobility because he has no use of his legs. He has no right arm use either, and he cannot write or hold objects with it. He has collected Social Security disability benefits since 2009. ECF 124-2 at 6, 12, 42-44, 51.

2.      Mr. Abreu has used marijuana since at least 2002 to alleviate pain. In 2002, while driving from New York to Florida, he was arrested for possession of thirteen pounds of marijuana. *Id*. at 18-21, 40.

3.      It was through his friend, Manny Noriega, that Mr. Abreu met Defendant Jason Weiss, Esq. Mr. Weiss recalls meeting Mr. Abreu first around 2014 in a context unrelated to ADA compliance litigation (either when Mr. Abreu accompanied Mr. Noriega to Mr. Weiss' house for a renovation project or as a client interested in the marijuana business). It was later, upon Mr. Noriega's suggestion, when Mr. Weiss incorporated Mr. Abreu (and Ms. Paloni) into his ADA litigation practice. ECF 151-16 at 20-27. Mr. Weiss and Mr. Abreu have not met in person often, just three to five times. ECF 124-2 at 11, 14-15; ECF 151-16.

4.      The record contains a letter from Louis J. Butera, D.O., of the Palm Beach Neurology medical practice dated June 25, 2015. Dr. Butera states that Mr. Abreu has been his patient for several years and suffers from moderately severe multiple sclerosis. Dr. Butera describes Mr. Abreu's condition as a paraparetic and totally disabled. ECF 125-10. At his deposition, Mr. Abreu denied ever seeing that letter and did not know why it was prepared. ECF 151-15 at 172. Mr. Weiss explained needing a description of Mr. Abreu's condition for the ADA complaints, and it was either Mr. Noriega or Ms. Paloni who obtained the letter for him. ECF 151-16 at 38.

5.      In October 2015, Mr. Abreu retained Mr. Weiss to represent him in ADA lawsuits. Pursuant to their arrangement, Mr. Abreu paid no legal fees, received no financial compensation from the ADA lawsuits, but was financially liable for any potential sanctions award. ECF 124-2 at 27; ECF 151-16 at 157-158.

6.      Mr. Abreu often travels with the help of Mr. Noriega. Mr. Noriega is physically able to lift him or help him move around. ECF 124-2 at 16.

7.      The two embarked on a long road trip whose purpose included investigating the medical marijuana business. That brought them to Colorado. *Id*. at 17-20. Mr. Abreu does not remember if his trip to Colorado in August 2015 also involved a trip to Illinois. ECF 151-15 at 184.

### 2.      George Merwin

8.      Mr. Weiss knew George Merwin through mutual friends, and it was Mr. Merwin who started Mr. Weiss working on ADA cases. ECF 151-16 at 21-22, 228.

9.      Mr. Abreu met Mr. Merwin through Mr. Noriega. Mr. Merwin is related to Mr. Noriega. ECF 151-15 at 34; ECF 151-16 at 228.

10.     Mr. Merwin accompanied Mr. Abreu and Mr. Noriega on their first trip to Colorado. On the second trip, Mr. Merwin already was in Colorado. ECF 151-15 at 128.

11.     Mr. Merwin, Ms. Paloni, and Mr. Weiss once vacationed together in Savannah, Georgia, but Ms. Paloni could not remember when. ECF 151-18 at 225-227.

### 3.     Janet Hoyt

12.     Mr. Weiss has a client by name of Janet Hoyt who also has brought many ADA public accommodation lawsuits. ECF 151-16 at 29-30. Mr. Weiss met Janet Hoyt through Mr. Merwin. *Id*. at 227.

13.     Mr. Weiss did not know whether his client was the same "Janet Hoyt" who notarized Mr. Abreu's affidavit on January 2017. *Id*. at 226.

### 4.     Christine Giovannia Paloni

14.     Ms. Paloni works for law firms determining whether properties are ADA compliant. ECF 151-18 at 19-26. The name of her business is Complete ADA Compliance. *Id*. at 41.

15.     Ms. Paloni stated that she received ADA National Certification in 2012 or 2013 online (*id*. at 22), but she was unable to produce in discovery any "certifications, licenses, and/or other documents detailing [her] qualifications as an ADA compliance expert" (ECF 151-10 at 6).

16.     Mr. Weiss recalls meeting Ms. Paloni through Mr. Merwin. ECF 151-16 at 72, 230. Ms. Paloni is unsure, but she believes she met Mr. Weiss through Howard Cohan, another ADA client plaintiff. ECF 151-18 at 102.

17.     According to Mr. Weiss, Ms. Paloni and Mr. Abreu already knew each other before Mr. Weiss met them. ECF 151-16 at 40. As Ms. Paloni recalls it, she had met Mr. Merwin first, then Mr. Weiss, and lastly Mr. Noriega and Mr. Abreu (ECF 151-18 at 224), but she does not remember how she met Mr. Abreu (ECF 151-13 at 3).

18.     Mr. Abreu recalled meeting Ms. Paloni through Mr. Noriega. ECF 151-15 at 43.

19.     Mr. Weiss has visited Ms. Paloni in Arizona. ECF 151-16 at 78, 153-154; ECF 151-18 at 16.

20.     Mr. Weiss believes that Ms. Paloni had employees who confirmed the presence of ADA violations. ECF 151-16 at 115-116. Ms. Paloni denied that anyone worked for her, although occasionally and only in Florida, she conceded, others would go take measurements for her. ECF 151-18 at 229-232.

21.     Both Ms. Paloni and Mr. Weiss stated that they spoke with each other since the filing of the present federal lawsuit. ECF 151-18 at 249-250; ECF 151-16 at 79. Mr. Weiss added that he informed her of the instant federal lawsuit. ECF 151-16 at 79. Ms. Paloni denied discussing Plaintiffs' claims against them or learning about this litigation from Mr. Weiss. ECF 151-18 at 250.

22.     Ms. Paloni knows an attorney by name of Mark Feinstein (*id*. at 95). An attorney by that same name represented Mr. Abreu in his deposition in the instant federal lawsuit. ECF 151-15 at 2.

23.     Ms. Paloni has instructed Janet Hoyt how to document ADA violations. ECF 151-18 at 111-112.

5.      Mr. Abreu's Florida Lawyers

24.     Signing the complaint for the underlying federal lawsuit as co-counsel was Jason S. Weiss, Esq., of Weiss Law Group, P.A. That law practice is in Florida. ECF 1 (filed in 16-cv-00432-MEH) at 11. He has brought 279 lawsuits in total on Mr. Abreu's behalf, of which seventy were filed in Colorado. ECF 151-16 at 28.

25.      Later, Peter S. Leiner, Esq., of the Weiss Law Group, P.A., appeared in the underlying federal lawsuit on Mr. Abreu's behalf. Mr. Leiner filed the summary judgment motion, but soon afterwards, he quit his employment at the Weiss Law Group, P.A. *Id*. at 167-168.

6.      Mr. Abreu's Colorado Lawyers

26.      Brett N. Huff, Esq., of the Huff & Leslie, LLP law firm, filed the complaint that commenced the underlying federal lawsuit. ECF 1 (filed in 16-cv-00432-MEH) at 11. Later, Richard W. Leslie, Esq., of that same law firm appeared on Mr. Abreu's behalf.

27.      Mr. Huff has never met Mr. Abreu. It was Mr. Weiss who contacted Mr. Huff for assistance in bringing ADA violation lawsuits in Colorado. ECF 151-19 at 9. He first started filing ADA public accommodation lawsuits after meeting Mr. Weiss. *Id*. at 14.

28.      The above attorneys disagree whether (1) the Colorado lawyer Defendants' role was limited strictly to that of passive local counsel or (2) whether the Colorado lawyer Defendants acted as lead counsel on cases filed in Colorado.

29.      According to Mr. Huff, theirs was an entirely secondary role, acting at Mr. Weiss' direction. It was Mr. Weiss who handled all communications with Mr. Abreu and Ms. Paloni, and who paid litigation fees. Mr. Huff filed lawsuits based on the information that Mr. Weiss provided him; discussed pending lawsuits with him; served Colorado defendants; and communicated with Colorado defendants to help settle them. *Id*. at 18-20, 23-24, 28-34, 53-54. He also spoke with Mr. Leiner. *Id*. at 36-37.

30.      Almost all of the Colorado ADA cases of which he was part settled. Often Mr. Weiss would inform him for how much to settle a case. *Id*. at 63.

31.     Mr. Huff's law practice was involved in ADA litigation for less than a year, from early 2016 until September 2016. Mr. Huff transitioned remaining active lawsuits back to Mr. Weiss. The work was not profitable. *Id*. at 38, 61.

32.     By contrast, Mr. Weiss described Mr. Huff as acting independently on the Colorado lawsuits and taking charge of them. ECF 151-16 at 35, 65. Mr. Weiss added that Mr. Huff would add his name to the cases without his knowledge. *Id*. at 134.

**B.     Mr. Abreu's Colorado Travels**

33.     Mr. Abreu and Mr. Noriega carried no credit cards with them on their trip. ECF 151-15 at 146. Mr. Abreu withdrew cash at ATMs from the account in which his Social Security disability benefit was deposited. *Id*. at 123.

34.     Mr. Abreu spent most of his money on marijuana while in Colorado for medicinal purposes. *Id*. at 124.

35.     Mr. Abreu did not fly to Colorado. The last time he traveled by airplane was in 2010 to Maryland. *Id*. at 61, 176.

36.     Defendants produced in discovery a one-way airline ticket bought in Mr. Abreu's name for a March 9, 2016 flight from Fort Lauderdale to Denver. ECF 151-11. Not only was that flight nine months after Mr. Abreu's Riverbend visit, but the airline said the flight was neither actually taken nor rebooked (ECF 151-12). Mr. Weiss explained that either Ms. Paloni or Mr. Noriega gave him the ticket when he asked for proof of Mr. Abreu's travel to Colorado. ECF 151-16 at 173.

37.     On their two trips to Colorado from Florida, Mr. Abreu and Mr. Noriega traveled by motor vehicle. ECF 151-15 at 127-128. As Mr. Abreu testified at his deposition, the two

traveled in a minivan borrowed from George Merwin that had a wheelchair lift. *Id*. at 53. Mr. Weiss described it as an RV that was not ADA accessible. ECF 151-16 at 173, 177, 180, 233.

38.     Neither Mr. Weiss nor Mr. Huff saw any purchase receipts by him during his travels from Florida to Colorado (or produced such receipts in discovery). *Id*. at 112, 180-181; ECF 151-19 at 115. The only document indicative of travel that was produced was the airline ticket which postdated the Riverbend visit by nine months and was not even used in the first place. ECF 151-16 at 179-180.

39.     Mr. Abreu brought no ADA public access lawsuits against businesses from their travels *between* Florida and Colorado. ECF 151-15 at 208.

40.     Mr. Abreu does not remember all the places he visited during his trip to Colorado. However, he does remember seeing signs for Colorado Springs.[1] *Id*. at 62.

41.     He remembers being in Durango with Mr. Noriega to visit a friend there by name of Jesus. Mr. Abreu wanted to start a marijuana grow business and was looking for a place to live. During his time in Durango, Mr. Abreu also monitored for ADA violations, and from that effort, lawsuits were filed against Durango businesses, mostly hotels. *Id*. at 63-69.

42.     Mr. Abreu left Durango and traveled to the town of Bailey (where the Riverbend restaurant was located). Jesus had a cousin, Teresa, who lived there and whom Mr. Abreu already knew. *Id*. at 70-71.

43.     Mr. Abreu stayed in Denver with friends. *Id*. at 72.

---

[1] Plaintiffs say that the record contains five receipts from the Broadmoor Hotel in Colorado Springs for items purchased their over three consecutive days. Plaintiffs add that there are 240 photographs of the Broadmoor. Plaintiffs explain that they did not submit the Broadmoor Hotel records as an exhibit because the file was too large. ECF 151 at 19, ¶ 3.

44.     Mr. Abreu does not remember visiting Grand Junction or Telluride even though he sued businesses located there for ADA violations. *Id*. at 73-78. He explained that his primary activity while in Colorado was marijuana cultivation which entailed long workdays. The ADA lawsuits grew from ancillary visits to area businesses. *Id*. at 77-78.

45.     At some point, Mr. Abreu and Mr. Noriega traveled to Breckenridge to look for non-ADA complaint businesses. *Id*. at 73. The Weiss Defendants prepared a spreadsheet of the businesses that Mr. Abreu visited and when. ECF 151-5. It is too small to read, but Plaintiffs represent that it places Mr. Abreu in Breckenridge from July 10 to 14 and again from August 11 to 13 in 2015. ECF 151 at 20 at ¶ 8.

### C.     Riverbend Restaurant

46.     The company, Tavin Foods, Inc., was owned by Plaintiff Michael Abbondanza, the Schaefers, and the Jespersens. Tavin Foods, Inc. opened the Riverbend restaurant in April 2015 and operated it. Mr. Abbondanza and the Schaefers owned the real estate on which the restaurant sat. ECF 124-5 at 3-5.

47.     Mr. Abreu affirms that he actually was present at the Riverbend restaurant when, on July 14, 2015,[2] he and Mr. Noriega stopped there for lunch. Initially, as an attachment to the summary judgment motion filed in the underlying federal lawsuit, he submitted an affidavit in which he confirmed his allegations about visiting the restaurant and the barriers he encountered there. Mr. Abreu attested that "[o]n July 14, 2015, [he] personally visited [Riverbend] and purchased an antipasti salad to eat." ECF 50-1 (filed in 16-cv-00432-MEH) at ¶ 9. Janet Hoyt

---

[2] The spreadsheet at ECF 151-5 references an ADA public accommodation lawsuit that Mr. Abreu filed concerning barriers at a business that he encountered in Breckenridge on July 14, 2015. If Mr. Abreu also visited the Riverbend restaurant in Bailey, Colorado, on July 14, 2015, then the spreadsheet implies that Mr. Abreu traveled from Breckenridge to Bailey on that same day.

notarized his signature based on her personal knowledge of Mr. Abreu. Ms. Hoyt's notarization is dated "[an unspecified] day of January, 2017." *Id*. at 3. The Court observes that the affidavit's signature and notarization page is blurry and looks as if it had been signed and faxed separately from the rest of the document.

48.     Attached to the complaint in the underlying federal lawsuit is a photograph of a meal order ticket from the Riverbend restaurant. The photograph is incomplete. It shows only Riverbend's name and address; an order of antipasti for $10.9[ ]; and the date of [ ]-14-15 (potentially indicating *July* 14, 2015). There is the name, "Nicole," on the ticket which may refer to Nicole Garcia, a server at the Riverbend at that time. ECF 1-1 (filed in 16-cv-00432-MEH). The receipt was generated by the restaurant's Point-of-Sale (POS) system. ECF 124-5 at 7. It does not appear to be a receipt *of payment* for the meal. Mr. Abreu testified at his deposition that Mr. Noriega paid the bill in cash. ECF 151-15 at 146.

49.     On June 26, 2019, Mr. Abreu signed another affidavit. He repeated that "[o]n July 14, 2015 [he] personally visited the Riverbend [restaurant]." He added that he had "experienced violations of the 2010 Americans With Disabilities Act" while there, and he requested his lawyers to file suit against Riverbend. ECF 125-8. John Bradley notarized the document and identified Mr. Abreu by his State of Florida Identification Card. *Id*. Mr. Bradley is a Florida lawyer and friend of Mr. Weiss. ECF 151-16 at 9.

50.     One of the above affidavits—presumably the first but Plaintiffs do not specify— Mr. Abreu denied reading before signing it. Mr. Noriega brought it to him for his signature and took it back to Mr. Abreu's attorney. ECF 151 at 11, ¶ 8; ECF 151-15 at 240.

51.     At his deposition taken for purposes of the instant lawsuit, he explained that he and Mr. Noriega chose the Riverbend restaurant at random. He did not use his scooter because he saw

no ramp leading from the parking lot into the restaurant. Instead, Mr. Noriega pushed him in his wheelchair. Upon entry, Mr. Abreu went into the restroom. The space was too small for him to be able to maneuver fully around in his wheelchair. By that point, he had become so angry that he lost his appetite and did not order a meal for himself. Instead, he shared the pasta with Mr. Noriega. Of note, Mr. Abreu did not remember the Riverbend visit until his lawyer showed him photographs in preparation for his deposition. ECF 124-2 at 22-26, 46.

52.     While at Riverbend, Mr. Abreu took photographs of the sink, grab bar, and toilet in the men's restroom as well as the front of the building to show the lack of a ramp. His photos were blurry and "all messed up." ECF 151-15 at 111.

53.     Mr. Abreu says it was not until his return to Florida when he gave Mr. Weiss the photos he had taken at Riverbend. ECF 124-2 at 31-32. Mr. Weiss does not remember conversing with Mr. Abreu about Riverbend. ECF 151-16 at 109.

54.     Mr. Weiss testified that Mr. Abreu also sent him receipts from his travels in Colorado that related to the ADA lawsuits. ECF 124-3 at 6.

55.     Months after the Riverbend visit, Mr. Abreu called Ms. Paloni and spoke with her. ECF 124-2 at 24; ECF 124-4 at 6-7. Before they met, Mr. Noriega forwarded the Riverbend photos to Ms. Paloni on Mr. Abreu's behalf. Mr. Noriega "would go and do the talking for [him]" because Mr. Abreu did not "like to talk to people." *Id*. at 38.

56.     According to Ms. Paloni, she received (via Dropbox) Mr. Abreu's photos and other data from Mr. Weiss. ECF 124-4 at 8. That is how Ms. Paloni knew the date of non-compliance and the initial inspection (by Mr. Abreu) was July 14, 2015. ECF 124-4 at 8. However, at his deposition, Mr. Weiss said he received the photos (via Dropbox) from Ms. Paloni. ECF 151-16 at 221-222.

D.      Breckenridge

57.      In January or February of 2016, Ms. Paloni was in Breckenridge. ECF 151-18 at 284.

58.      According to Ms. Paloni, she, Mr. Merwin, and Mr. Weiss met at the airport upon arrival in Colorado. They drove to Breckenridge in rental cars. ECF 124-4 at 4-5. Mr. Weiss recalls Mr. Merwin, Ms. Paloni, and Mr. Leiner present at their Breckenridge lunch meeting. ECF 151-16 at 76-77.

59.      Mr. Huff met Ms. Paloni through Mr. Weiss at that Breckenridge trip. He joined them in inspecting area businesses for ADA violations. ECF 151-19 at 11-13.

60.      Ms. Paloni does not remember whether she inspected any businesses there for ADA compliance. ECF 151-18 at 284.

E.      Ms. Paloni's Inspection

61.      At her deposition, Ms. Paloni stated that she left Breckenridge and drove to the Riverbend restaurant to verify the ADA violations.[3] The photos Mr. Abreu had sent her of the property "were a little blurry, to say the least." ECF 124-4 at 4.

62.      Ms. Paloni remembers visiting the property after the Breckenridge trip. *Id*. at 14.

63.      Mr. Abreu commenced the underlying federal lawsuit on February 23, 2016. At some point before the drafting of that complaint, Ms. Paloni gave Mr. Weiss her assessment of what the property's ADA violations were. In other words, Mr. Abreu's complaint was based on Ms. Paloni's observations. ECF 124-3 at 7; ECF 124-4 at 21.

---

[3] Ms. Paloni does not explain *how* she inspected the property. She does not say whether she did so openly or surreptitiously. She does not explain the circumstances by which she entered the men's restroom to take photographs of it.

64.     It was not until December 1, 2016, ten months after Mr. Abreu had filed the underlying lawsuit, when she wrote the Non-Compliance Report.  ECF 124-3 at 7; ECF 124-4 at 14.

65.     The Non-Compliance Report is in the record at ECF 124-4 at 27-34.  In it, she identified the following five barriers (out of a total of fourteen):

- **The men's room urinal was too high for a disabled person.** (Violation: failing to provide a urinal designed for a person with a disability where the rim height is no more than 17 inches from the finished floor in violation of 2010 ADAAG §§605 and 605.2.)

- **The men's room side grab bar was not long enough and slanted.** (Violation: providing grab bars of improper horizontal length or spacing on the back or side wall in violation of 2010 ADAAG §§604, 604.5, 604.5.1, 604.5.2, 609, 609.4 when resolution is readily achievable.)

- **The men's room toilet paper holder was installed at the wrong height.** (Violation: failure to provide toilet paper dispensers in the proper position in front of the water closet or at the correct height above the finished floor in violation of 2010 ADAAG §§604, 604.7 and 309.4 when resolution is readily achievable.

- **The men's room mirror was mounted too high.** (Violation: failure to provide mirror(s) located above lavatories or countertops at the proper height above the finished floor 2010 in violation of ADAAG §§603 and 603.3 when resolution is readily achievable.

- **The Premises lacked designated van accessible parking spaces.** (Violation: 2010 ADAAG §§208, 208.1 and 208.2.4.)

Of note, Ms. Paloni did not list the above violations in the same way as the Court summarizes and formats them above.

66.     Ms. Paloni included in her report two additional barriers.  The first was the lack of circular turning space in the men's restroom.  At her deposition, she attributed that barrier to how the trash can was placed in a way that prevented the entrance door from opening sufficiently.  The second concerned the handicap parking spot which allegedly lacked a signed and designated accessible entrance ramp into the restaurant. ECF 124-4 at 9-10, 17-19.  As Ms. Paloni explained at her deposition, the parking spot did have a handicapped parking sign, and there was a ramp on

the left-hand side. The problem instead was inadequate signage or path demarcation to show where the ramp was. ECF 151-18 at 162-164.

67.     Ms. Paloni was not paid for writing the Non-Compliance Report or any other work in the Riverbend case. She waived her fee as a professional courtesy to Mr. Weiss "because [the case] was getting dismissed" and "because the violations were being fixed." ECF 124-4 at 3, 25-26.

68.     Mr. Abreu testified at this deposition that at some point he did speak with Ms. Paloni, but he does not remember when. He also saw her report. ECF 151-15 at 87, 107. The conversation may have occurred after the lawsuit was filed.

69.     Ms. Paloni did not keep her records from the Riverbend matter. Once she gives a report to the law firm, she deletes her records. ECF 151-18 at 161-162, 168.

**F.     The Underlying Federal Lawsuit**

70.     Mr. Abreu purportedly visited the Riverbend on July 14, 2015, about three months after the restaurant's opening. The underlying federal lawsuit was first served on the Riverbend Defendants on February 25, 2016. By that point, Nicole Garcia (presumably the waitress who served Mr. Abreu) no longer worked at the restaurant. Mr. Abbondanza did not reach out to her after receiving notice of the lawsuit to ask her if she remembered anything about Mr. Abreu's visit. ECF 124-5 at 10; ECF 151-17 at 67-68. When he learned of the lawsuit, Mr. Abbondanza did ask the employees who remained at Riverbend if anyone remembered Mr. Abreu or his visit. ECF 151-17 at 67.

71.     Mr. Abreu attached an incomplete photo of his meal order ticket to his complaint, but Mr. Abbondanza did not look through Riverbend's POS system to locate the complete version of that document. *Id*. at 56-57.

72.     On April 6, 2016, Brett Huff, Esq., wrote a letter to Mr. Abbondanza which the latter construed as an offer to settle the lawsuit for $15,000. ECF 151-8. The letter informed him of Mr. Abreu's willingness "to resolve this matter right away, without the unnecessary costs and expense of protracted litigation, upon your written acceptance of the following terms." *Id*. at 5. The fourth stated term was the agreement "to make payment of all expert fees, court costs, costs of this lawsuit, and attorney fees that have been incurred and will be incurred in carrying out this resolution. This amount is estimated to be approximately $15,000." *Id*. At his deposition, Mr. Huff conceded making a settlement demand but denied asking for $15,000. ECF 151-19 at 69-70.

73.     Mr. Huff spoke with Mr. Abbondanza directly. Mr. Abbondanza vehemently denied any ADA violations, and in Mr. Huff's perception, he was very hostile about the lawsuit. *Id*. at 41.

74.     Mr. Abbondanza initially appeared as Tavin Foods, Inc.'s *pro se* representative for purposes of the lawsuit. From the beginning, Mr. Abbondanza described the allegations as "unfounded" and Mr. Abreu as "a serial plaintiff" who along with "his attorneys seem to have hundreds of boiler plate lawsuits in many different jurisdictions and states." Mr. Abbondanza regarded the lawsuit against him as part of a greater "scheme" by Mr. Abreu and his attorneys "to extract payment." ECF 9 (filed in 16-cv-00432-MEH). At the Scheduling Conference on July 14, 2016, Mr. Abbondanza repeated his denial of any ADA violations and his doubt whether Mr. Abreu actually had visited Riverbend. ECF 55 (filed in 16-cv-00432-MEH).

75.     On September 30, 2016, Courtenay Patterson, Esq., appeared on the company's behalf as *pro bono* counsel. ECF 30 (filed in 16-cv-00432-MEH).

76.     On October 19, 2016, Mr. Huff informed Ms. Patterson that he would be withdrawing as Mr. Abreu's co-counsel because he "may ultimately become a witness in this

case." ECF 151-9. He also complained about offensive and negative communications by Mr. Abbondanza's friends and supporters, and he requested Ms. Patterson to ask Mr. Abbondanza to stop them. *Id*. At his deposition, Mr. Huff complained about statements Ms. Patterson had made in local newspaper articles that expressed doubt over whether Mr. Abreu existed, whether he had visited Riverbend if he did exit, and Defendants' overall ADA litigation practice. Mr. Huff regarded Ms. Patterson's comments as defamatory. ECF 151-19 at 87-89.  He also complained about social media posts by Mr. Abbondanza. These had caused him to contemplate filing a counterclaim for defamation, and were he to join the lawsuit as a litigant, he could not continue to represent Mr. Abreu at the same time. *Id*. at 98. However, after withdrawing as counsel of record from the case, he decided against joining the lawsuit as a party. *Id*. at 101.

77.     Tavin Foods, Inc. hired Mark Douglass to inspect the Riverbend property. Mr. Douglass prepared his Site Accessibility Evaluation report on December 6, 2016. ECF 49-1 (filed in 16-cv-00432-MEH). Mr. Douglass agreed with Ms. Paloni that the property contained the below access barriers:

- **The men's room urinal was too high for a disabled person (repair cost $800-1,200.** (Violation: 2010 ADAS § 605.2.) (ECF 49-1 at 6).

- **The men's room side grab bar was not long enough and slanted (repair cost $40-80.** (Violation: 2010 ADAS § 604.5.1.) (ECF 49-1 at 7).

- **The men's room toilet paper holder was installed at the wrong height (repair cost $5-10).** (Violation: 2010 ADAS § 604.7). (ECF 49- 1 at 8).

- **The men's room mirror was mounted too high (repair cost $75- 125).** (Violation: 2010 ADAS § 603.2). (ECF 49-1 at 9).

- **The Premises lacked designated van accessible parking spaces and signage (repair cost $75-150).** (Violation: 2010 ADAS § 502.6.) (ECF 49-1 at 16).

Of note, the foregoing constitutes a summation and reformatting of the report's contents and the citations to ECF 49-1 are for 16-cv-00432-MEH.

78.     Apart from the two expert reports, no discovery was undertaken in the first lawsuit. However, between January 13 and February 9, 2017, Ms. Patterson did make efforts to depose Mr. Abreu. ECF 8-1 at ¶¶ 36-38 and accompanying attachments; ECF 151-4.

79.     Mr. Weiss and Ms. Patterson spoke on February 9, 2017, shortly after Mr. Abreu had filed his summary judgment motion. Mr. Weiss accepted Ms. Patterson's representation that the remaining ADA violations had been fixed. ECF 124-3 at 10-11. Mr. Weiss asked for no verification of the remediations and sent Ms. Patterson a draft dismissal stipulation. ECF 151-16 at 96-97.

80.     That next day, the parties jointly filed their Stipulation of Dismissal with Prejudice. Each party agreed to bear their own fees and costs. ECF 53 (filed in 16-cv-00432-MEH).

81.     Mr. Weiss did not confer with Mr. Abreu before voluntarily dismissing the case. Mr. Weiss explained that Mr. Abreu gave him the latitude to settle his ADA lawsuits and to secure ADA-compliant remediations. ECF 151-16 at 161-163.

82.     Mr. Weiss explained that neither Mr. Abreu nor Ms. Paloni wanted to travel back to Colorado for the Riverbend matter. *Id*. at 163-165.

83.     Tavin Foods, Inc. created no periodic profit and loss income statements or balance sheets for its Riverbend restaurant business. ECF 124-5 at 6. Tax returns show that Tavin Foods, Inc. operated at a loss from 2105 through 2020. ECF 127-1. Plaintiffs note in their Response that the Riverbend restaurant was open only between April 2015 and October 2016 (and then reopened in June 2018). ECF 151 at 17, ¶ 29.

84.     The record contains a minute sheet from a meeting held on April 11, 2017 presumably of stakeholders in the Riverbend restaurant and/or Tavin Foods, Inc. It describes Tavin

Foods, Inc. as being defunct and out of business, without assets, and unable to resume operations without a cash infusion.

### G.      The State Court Lawsuit

85.      On August 4, 2017, six months after the federal case's dismissal, Mr. Abbondanza and Tavin Foods, Inc. brought suit against the Schaefers in Park County District Court, Case No. 2017CV30020. An attorney represented Mr. Abbondanza and Tavin Foods, Inc. for purposes of litigating that civil action. They claimed breach of the investment agreement that had created the Riverbend business, and they blamed Mr. Schaefer's mismanagement for the restaurant's failure. ECF 50-10.

86.      The Schaefers counterclaimed that it was Mr. Abbondanza who mismanaged the restaurant and who is responsible for its closure. ECF 125-4. The Jespersens intervened to allege that Mr. Abbondanza solicited their investment with the false representation that Riverbend had no debt. ECF 125-6 at 3, ¶ 11.

87.      On January 31, 2019, after two years of litigation, the state court lawsuit settled at mediation. ECF 125-7.

### H.      The Instant Federal Lawsuit

88.      Before they commenced the instant lawsuit, Ms. Patterson, on Plaintiffs' behalf, sent demand letters to Mr. Weiss and Mr. Huff requesting documentary proof of Mr. Abreu's trip to Colorado and his Riverbend visit. In addition, Ms. Patterson described the litigation conduct in terms of abuse of process, civil conspiracy, fraud, and a RICO violation. She invited offers to settle those potential claims. ECF 1-11; ECF 1-12; ECF 1-13; ECF 1-14.

89.      Mr. Weiss did not respond to the letter. He regarded it as extortive and inconsistent with the stipulated nature of the lawsuit's dismissal. ECF 151-16 at 96-97.

90.     Mr. Huff did not respond because of its aggressive tone. He regarded the letter as making baseless threats and the earlier newspaper articles as defamatory. ECF 151-19 at 84-87.

91.     On February 7, 2019, soon after the conclusion of the state court lawsuit, Mr. Abbondanza commenced the instant federal lawsuit. ECF 1. On February 28, 2019, Tavin Foods, Inc. joined as a Co-Plaintiff. ECF 8.

92.     On February 11, 2021, the Court held a hearing on Defendants' Motion to Compel RICO Statement. Both before filing the instant lawsuit and up to that point, Plaintiffs felt that their questions about Mr. Abreu had gone unanswered. The Court used the hearing to obtain Defendants' position. Mr. Weiss informed the Court that Mr. Abreu was in fact a real person who actually visited the Riverbend on July 14, 2015. The Court accepted that representation although allowed discovery on the matter. ECF 102.

## LEGAL STANDARD

### I.     Fed. R. Civ. P. 56(c)

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). "Summary judgment is not a disfavored procedural shortcut. Instead, it is an important procedure designed to secure the just, speedy and inexpensive determination of every action." *Evans v. Cawthorn*, No. 16-3095-DDC-ADM, 2019 WL 5787952, at *3 (D. Kan. Sept. 6, 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)).

A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if

it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party must assert a set of facts, that if could be found to be true, would enable it to prevail on the claim. To meet that burden, the opposing party may not rest on the allegations contained in the complaint but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247–48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324. In other words, the opposing party must do more than make a conclusory denial of an asserted material fact but explain the reason for the denial with an accompanying specific reference to the evidentiary record. *Am. Auto. Ins. Co. v. Marlow*, 666 F. Supp. 2d 1209, 1212 (D. Colo. 2009); Section III(F) of the undersigned's Practice Standards---Civil Actions. If the parties tell two different stories, one of which is blatantly

contradicted by the record so that no reasonable jury could believe it, the court should not adopt that version. *Pierson v. Bassett*, 534 Fed.Appx. 768, 771 (10th Cir. 2013).

"[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

### I.   Two Primary Fact Questions

To begin, the dispute over whether Mr. Abreu is a real person has been resolved (although not after some delay before Defendants volunteered clarifying information). Nor is there a dispute over whether he has physical disabilities that impair mobility. What does remain in dispute is whether Mr. Abreu physically went to the Riverbend restaurant and whether Ms. Paloni conducted an in-person inspection at the property.

#### A.   Did Mr. Abreu Actually Visit the Riverbend Restaurant?

Mr. Abreu does not convince Plaintiffs that he actually went to their restaurant. Plaintiffs highlight his inability to remember details and the inconsistencies with testimonies of others. Plaintiffs also stress the lack of confirmatory documentary evidence. Despite the centrality of that particular issue, Defendants produced no evidence that directly and conclusively corroborates his presence at the Riverbend. Mr. Abreu's travels, either to the Riverbend specifically or through Colorado generally, created no paper trail. The only record of the places he visited in Colorado are the ADA lawsuits that he filed (which Plaintiffs contend resulted from Defendants' scheme to

extort settlements through baseless litigation) or perhaps the receipts and photographs of the Broadmoor Hotel in Colorado Springs which Plaintiffs mention at ECF 151 at 19, ¶ 3.

Even if Defendants do not corroborate Mr. Abreu's presence at the Riverbend in a conclusive fashion, that does not defeat the entry of summary judgment. It is Plaintiffs' burden to show a genuine dispute over that point. Mr. Abreu may have a poor memory of his Colorado travels. Many details may be inconsistent, both internally in Mr. Abreu's own description of what happened and with the reports of others. However, none of those inconsistencies[4] are sufficient to create a material issue of fact over whether Mr. Abreu was at the restaurant.

Although there may be no directly conclusive evidence, the record does contains some supportive circumstantial evidence. A meal order ticket was attached to the underlying complaint (which Mr. Abbondanza does not dispute came from his restaurant), and at his deposition, Mr. Abreu discussed many aspects of his trip including what drew him to various towns (including Bailey, where the Riverbend was located) and the activities he pursued while in Colorado. Mr. Abreu explained why there is no record of air travel (he traveled in a borrowed RV or van), and he identified those personally knowledgeable of the trip (such as Mr. Noriega and Mr. Merwin). Riverbend's own ADA expert found access barriers at the property some of which were similar to what Mr. Abreu included in his complaint. That could be mere coincidence, but it does tend to provide some confirmation (that, by contrast, would not exist had Riverbend's expert found no ADA violations or materially different ones than what Mr. Abreu reported seeing).

---

[4] In their Reply, the Huff Defendants summarize the inconsistencies that Plaintiffs highlight. Plaintiffs challenge matters such as how many times Mr. Weiss and Mr. Abreu actually met and where; the parties' various discussions about ADA lawsuits and the underlying lawsuit; how Defendants exchanged restaurant photographs; the details in Mr. Abreu's and Ms. Paloni's recollections of their visits to the restaurant and Colorado; and the differences between how Mr. Huff and Mr. Weiss described the Huff Defendants' participation in their ADA lawsuits. ECF 156 at 10-11.

On the other hand, Plaintiffs submit no evidence to contradict his testimony or that suggests Mr. Abreu was *not* at the restaurant. As noted above, Plaintiff must do more than simply question his credibility to survive summary judgment review.

### B.    Ms. Paloni

Plaintiffs do not challenge the occurrence of Ms. Paloni's trip to Breckenridge, Colorado. Were she in fact in Breckenridge, that at least increases the probability that she also traveled through the town of Bailey and actually visited the Riverbend property (more than if, by comparison, there was no indication of her presence in Colorado at all). Nevertheless, even if the Court were to assume she did not in fact visit Riverbend and prepared her report without the benefit of in-person verification, the point is not material. For the reasons the Court explains below, the submission of false evidence does not constitute a predicate act for purposes of bringing a federal RICO claim.

## II.    RICO

Plaintiffs accuse Defendants of engaging in activity that violates the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–2965 ("RICO"). RICO creates a private cause of action for injuries to a plaintiff's business or property. 18 U.S.C. § 1964(c). The elements of a civil RICO claim are (1) racketeering activity in violation of 18 U.S.C. § 1962(c), (2) injury to the plaintiff's business or property, and (3) a causal relationship between the defendants' violation and the plaintiff's injury. *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 881 (10th Cir. 2017). The Court also stated the elements of a prima facie RICO claim in the Order Denying Defendants' Motions to Dismiss rendered earlier in this lawsuit. ECF 41. The racketeering element in turn requires the showing that the Defendants each (a) conducted the affairs (b) of an enterprise (c) through a pattern (d) of racketeering activity. *Hickenlooper*, 859 F.3d at 882.

The RICO statute defines "racketeering activity" by a list of predicate acts. 18 U.S.C. § 1961(1). Potentially relevant here are the acts of extortion, 18 U.S.C. § 1961(1)(A), or mail and wire fraud, 18 U.S.C. § 1961(1)(B). Plaintiffs must demonstrate how Defendants' conduct falls within the scope of either of those two provisions.

Plaintiffs allege that Defendants brought a baseless lawsuit for the purpose of obtaining a quick settlement. Abusive litigation, while extortive in nature, is not kind the extortion that is actionable under RICO. *Bixler v. Foster*, 596 F.3d 751, 758 (10th Cir. 2010) (citing *Deck v. Engineered Laminates*, 349 F.3d 1253, 1258 (10th Cir. 2003)). This Court cited *Bixler* for the general rule that "[a]busive litigation, alone, cannot form a proper predicate act under RICO" in the prior Order. ECF 41 at 5.

Consequently, Plaintiffs focus their RICO theory on mail and wire fraud. The type of fraud which serves as a RICO predicate act is not common law fraud. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 653 (2008). Rather, it is conduct that would be indictable under 18 U.S.C. § 1341 or § 1342. 18 U.S.C. § 1961(1)(B). Such an offense occurs when someone uses the mail (or means of electronic communication) for the purpose of executing a fraud scheme. The gravamen of the offense is the scheme to defraud, and the two statutes cover any such communication that is incidental to an essential part of the scheme, even if the communication contained no false information itself. *Bridge*, 553 U.S. at 647 (internal citations omitted). At issue here is whether Defendants' use of the mail and electronic means of communication to prosecute the lawsuit may be couched in terms of mail or wire fraud.

Plaintiffs argue that the prior Order Denying Defendants' Motions to Dismiss (ECF 41) resolves this issue in their favor. In that discussion of the matter, the Court noted how "[i]t seems unsettled . . . whether mail and wire fraud can be a proper predicate act when those acts occurred

in the context of litigation" and how "the context of the allegedly fraudulent litigation seems relevant." ECF 41 at 6. Seeing the potential of a plausible claim, the Court declined to dismiss the RICO claim on this basis. *Id*. at 7. Plaintiffs discuss the matter no deeper in their current response in opposition to summary judgment. However, the prior ruling on which Plaintiffs rely does not necessarily foreclose the matter. The Court may revisit it on summary judgment and reach a different conclusion after development of a factual record. *Estate of Roemer v. Shoaga*, No. 14-cv-01655-PAB-NYW, 2019 WL 4645441, at *5, n.7 (D. Colo. Sept. 24, 2019).

The Court now has the benefit of further briefing and the subsequently rendered decision of *Ghandi v. Ehrlich*, No. 19-cv-03511-SDG, 2020 WL 5633416 (N.D. Ga. Sept. 21, 2020). This fuller discussion adds nuance to the question of whether the mail and wire fraud predicate may be based on frivolous litigation. Consistent in the case law is the strong reluctance to recognize litigation activities as mail and wire fraud even if undertaken in the pursuit of baseless or bad faith litigation. Allegations of frivolous litigation, perjury, or deceit upon the court instead should be raised in the civil action itself. *Curtis & Assocs., PC v. Law Offices of David M. Bushman, Esq*., 758 F. Supp. 2d 153, 173-74 (E.D.N.Y. 2010). Alternatively, an aggrieved litigant may avail itself of the state tort causes of action of malicious prosecution or abuse of process. The private RICO civil cause of action does not supplant those means of redress. *Curtis*, 758 F. Supp. 2d at 174.

While case law shows reluctance to expand RICO's coverage to the "litigation activities" context, there is no absolute bar. *Kim v. Kimm*, 884 F.3d 98, 105 (2nd Cir. 2018) ("declin[ing] to reach the issue of whether all RICO actions based on litigation activity are categorically meritless"). Precedent leaves room for the possibility that a RICO claim could be based on them–but only if there is something more to the defendants' conduct beyond merely filing an unjustified lawsuit. *Curtis*, 758 F. Supp. 2d at 175-76. This same qualifier applies when the RICO predicate

act of extortion is based on litigation activities. *Langan v. Smith*, 312 F. Supp. 3d 201, 206 (D. Mass. 2018) (distinguishing two cases in which RICO claims survived dismissal because the litigation activities were part of a larger extortive scheme). The case of *U.S. v. Eisen*, 974 F.2d 246 (2nd Cir. 1992) provides one such example. The defendants were part of a law practice that brought fraudulent personal injury lawsuits and whose conducted included bribing witnesses and creating false evidence. The Second Circuit affirmed the defendants' criminal RICO conviction following a jury trial. *Curtis* highlights how the fraud in *Eisen* was much wider in scope. The attorneys had gone "well beyond their capacities as legal representatives in conducting their fraudulent scheme"; the wrongdoings "amounted to far more than mere 'litigation activities' [to involve] an extensive and broader scheme"; and the underlying scheme "was entirely external to, and independent of, any of the particular disputes between the litigants in the civil actions that were improperly filed and litigated." *Curtis*, 758 F. Supp. 2d at 175-76 (internal citations to *Eisen* omitted). Later, in *Kim v. Kimm*, 884 F.3d 98, 105 (2nd Cir. 2018), the Second Circuit repeated the need for the scheme to involve wrongdoing outside the litigation, such as out-of-court activity or corruption. *Deck v. Engineered Laminates*, 349 F.3d 1253, 1258 (10th Cir. 2003) offers another example. There, the Tenth Circuit rejected the allegation of meritless, baseless litigation as a predicate RICO offense, but it accepted the additional allegation that defendants induced a settlement agreement by making a false promise to pay the agreed sum and misrepresented that the entity defendant no longer existed.

The Court notes that Plaintiffs allege a scheme of bringing multiple baseless lawsuits. That is materially different than the situation in *Kim* and *Langan* which involved the commencement of just one lawsuit. However, case law also addresses the context of a prolific ADA litigation practice. In *Ghandi v. Ehrlich*, No. 19-cv-03511-SDG, 2020 WL 5633416 (N.D. Ga. Sept. 21, 2020), the

court applied the above statements of law to dismiss a RICO claim premised on allegations similar to Plaintiffs', because they did not meet either the extortion or mail/wire fraud predicates. The Court adds that Plaintiffs have no evidence that Mr. Abreu's other lawsuits were frivolous, in contrast to those cases, such as *Eisen*, in which there was direct evidence of how the law practice brought baseless lawsuits on the whole.

Moreover, the case now has passed the pleading stage, and Plaintiffs no longer may rely on their allegations that call into question whether Mr. Abreu actually exists, and if so, whether he is disabled; whether he visited the Riverbend; whether he encountered barriers there. The record now contains evidence that was not available when the dismissal order was rendered on October 23, 2019.

The dispositive issue here is whether Plaintiffs show a genuine dispute of material fact sufficient to permit a factfinder to find the occurrence of the requisite predicate acts. The evidentiary record does not show a fraud scheme beyond the litigation activity itself. Even if the Court were to accept that Ms. Paloni's report contained misrepresentations (such as if she did not actually inspect Riverbend or did not observe the barriers reported), the act of submitting a witness's false declaration is not enough to prevail on a RICO claim. *Kim*, 884 F.3d at 105 (dismissing a RICO claim premised on the filing of *four* fraudulent witnesses' declarations).

To summarize, the Court found Plaintiffs' RICO claim to be plausibly pleaded, but after consideration of additional case law and the more complete record on summary judgment, the standard for using litigation activity to satisfy RICO's predicate act element appears stricter than initially applied. Even considering the ruling from the Order on Defendants' Motions to Dismiss (ECF 41), the present record still would not support the claim. There is no evidence of fraudulent activity that occurred "entirely external to, and independent of," the dispute over whether the

Riverbend violated the ADA's public access requirements. Instead, Plaintiffs' RICO theory is premised on that lawsuit itself. The Court finds Defendants entitled to summary judgment on that basis.

## III.   Supplemental Jurisdiction

Citing 28 U.S.C. § 1331, Plaintiffs assert that this Court has subject matter jurisdiction over their lawsuit because of the federal RICO question (ECF 8-1 at 1, ¶ 1), but the Court now recommends granting summary judgment in Defendants' favor on that claim. Should Circuit Judge Tymkovich adopt this Recommendation, there will be no other federal question to support Section 1331 subject matter jurisdiction. Because Plaintiffs, who are Colorado citizens, bring suit against other Colorado citizens, there is no complete diversity of citizenship to support federal subject matter jurisdiction under 28 U.S.C. § 1332 as an alternative. No party currently raises the issue of supplemental jurisdiction over the remaining state law claims. This is a jurisdictional question the Court must address.

Section 1367(c)(3) of 28 U.S.C. provides that a district court has the discretion to decline to exercise supplemental jurisdiction over a state law claim if the district court has dismissed all claims over which it has original jurisdiction. *VDARE Found. v. City of Colo. Springs*, 449 F. Supp. 3d 1032, 1051 (D. Colo. 2020) (internal citation omitted). The Tenth Circuit has frequently approved the decision not to exercise supplemental jurisdiction over state claims after the dismissal of all federal claims. *E.g.*, *Strain v. Regalado*, 977 F.3d 984, 997 (10th Cir. 2020); *Hubbard v. Oklahoma*, 759 F. App'x 693, 713-15 (10th Cir. 2018); *Kinney v. Blue Dot Servs. of Kan.*, 505 F. App'x 812, 815 (10th Cir. 2012); *Dixon v. Sullivan*, 28 F. App'x 810, 813 (10th Cir. 2001); *Smith v. City of Enid ex. rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction

over any remaining state claims.") (emphasis added). "'[N]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary.'" *Brooks v. Gaenzle*, 614 F.3d 1213, 1230 (10th Cir. 2010) (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 2011)), *abrogated on other grounds by Torres v. Madrid*, 141 S. Ct. 989 (2021); *see also Kinney v. Blue Dot Serv. of Kan.*, 505 F. App'x 812, 814–15 (10th Cir. 2012) (affirming district court's decision to not exercise supplemental jurisdiction over state law claims when federal claims were dismissed).

Here, the Court recommends declining to exercise supplemental jurisdiction over Plaintiffs' state law claims for three reasons. First, the Tenth Circuit expressed a preference for trial courts to decline the exercise of supplemental jurisdiction when all federal claims have been dismissed. *Bauchman for Bauchman v. W. High Sch.*, 132 F.3d 542, 549 (10th Cir. 1997) ("If federal claims are dismissed before trial, leaving only issues of state law, 'the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.'") (quotation omitted). That is the situation that this Recommendation creates. There is the issue of whether the Court should rule on the remaining state law claims. However, as Chief Judge Brimmer has observed, "the parameters of the Court's discretion, if any, to exercise supplemental jurisdiction are far from clear." *Sisneros v. Taylor*, No. 09-cv-01646-PAB-MJW, 2011 WL 2292194, at *1 (D. Colo. June 8, 2011). That court recognized that there are Tenth Circuit decisions which "can be construed as finding that it can never be an abuse of discretion to *decline* to exercise supplemental jurisdiction." *Id.* at *1 n.4 (citing *Muller v. Culbertson*, 408 F. App'x 194, 197 (10th Cir. 2011)). Put differently, under such an understanding, "only the retention of jurisdiction can lead to claims of error. It is unclear, however, under what circumstances it would be an abuse of discretion to do so." *Id. Compare Jensen v. Reeves*, 3 F. App'x 905, 911 (10th Cir. 2001) (finding no abuse of

discretion in exercise of supplemental jurisdiction over state claims when all federal claims had been dismissed) *with Sandberg v. Englewood, Colo.*, 727 F. App'x 950, 965 (10th Cir. 2018) (concluding "the district court erred by exercising jurisdiction over the state law claims after it had dismissed the federal causes of action"). Given the uncertainty, the Court relies heavily on the abundance of cases holding that the presumption should be to *decline* the exercise of jurisdiction.

Second, "[t]he Court concludes that any potential delay or duplication resulting from a dismissal without prejudice does not constitute a compelling reason to retain jurisdiction." *U.S. v. Ledford*, No. 10-cv-01351-PAB-MEH, 2012 WL 1079552, at *3 (D. Colo. Mar. 30, 2012); *see also Hamilton v. Upper Crust, Inc.*, No. 10-CV-0718-CVE-PJC, 2011 WL 3880932, at *10 (N.D. Okla. Sep. 2, 2011) ("The Court finds that the Tenth Circuit's expressed preference for declining pendent jurisdiction outweighs the parties' slight interest in preventing delay."). Although substantial litigation has been undertaken in this federal court, the case law nonetheless militates in favor of declining jurisdiction. The Court adds that discovery is not yet completed as the March 23, 2022 Discovery Conference demonstrated. ECF 162.

Third, "the Court notes that 'Colorado law recognizes if a plaintiff asserts all of his or her claims, including state law claims, in federal court, and the federal court declines to exercise supplemental jurisdiction over the state claims, the plaintiff may refile those claims in state court.'" *Ledford*, 2012 WL 1079552, at * 3 (quoting *Brooks*, 614 F.3d at 1230); *see also* 28 U.S.C. § 1367(d) (providing that the state's applicable statute of limitations "shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period"). In other words, declining supplemental jurisdiction will not negate Plaintiffs' ability to continue the litigation of the remaining claims.

The Court recommends that the remaining state law claims be dismissed without prejudice to Plaintiffs' ability to refile them in Colorado state court. *See Thiess v. City of Wheat Ridge*, 823 F. App'x 682, 685-86 (10th Cir. 2020); *Hubbard*, 759 F. App'x at 714. This entails not only the claims of abuse of process (Fourth Cause of Action), civil conspiracy (Fifth Cause of Action), and fraud (Sixth Cause of Action), but also the Colorado Organized Crime Control Act, C.R.S. § 18-17-101, *et seq.*, ("COCCA") (Third Cause of Action).

## <u>CONCLUSION</u>

From the beginning, Mr. Abbondanza questioned the very basis of the ADA lawsuit that Mr. Abreu filed against Tavin Foods, Inc. Doubting Mr. Abeu's existence, Tavin Foods, Inc. sought to depose him, but Mr. Abreu voluntarily dismissed the case before that discovery was undertaken. Tavin Foods, Inc. pursued no other means to test the allegations' perceived frivolity within the context of that lawsuit itself. Instead, after questions about the lawsuit's foundation remained unanswered, Tavin Foods, Inc. (now joined by Mr. Abbondanza) commenced this civil action, expressing their concerns in terms of abuse of process and fraud. One iteration of their core underlying grievance was as a RICO cause of action. A federal RICO violation has a precise definition, and the evidentiary record does not show the kind of expanded scheme–beyond the activities of the lawsuit–needed to convert what is in essence an abuse of process or malicious prosecution claim under it. Defendants are entitled to summary judgment on the federal RICO claim. That leaves Plaintiffs' other theories of relief, but because they all are under state law, Tenth Circuit precedent counsels against this federal court exercising supplemental jurisdiction to consider them.

Accordingly, the Court respectfully recommends[5] that the Motions for Summary Judgment [filed June 30, 2021; ECF 124, 125, 129] be **granted in part** with respect to Plaintiffs' federal RICO claim (and related federal RICO conspiracy claim), and that summary judgment be entered in Defendants' favor as to them. The Court recommends that the Motions for Summary Judgment otherwise be denied without prejudice with respect to the merits of the remaining state law claims. Instead, those claims should be dismissed pursuant to 28 U.S.C. § 1367(c)(3) for lack of supplemental jurisdiction, permitting Plaintiffs to refile them in Colorado state court.

Respectfully submitted this 24th day of March, 2022, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty

Michael E. Hegarty
United States Magistrate Judge

---

[5] Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive or general objections. A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a *de novo* determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted or adopted by the District Court. *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)).